Leonid Kandinov
MORRIS KANDINOV LLP
550 West B Street, 4th Floor
San Diego, CA 92101
(619) 780-3993
leo@moka.law

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY IRVING, YAAKOV STRAUSS, and SANTOSH KUMAR, individually on behalf of themselves and all others similarly situated,<br><br>                         Plaintiffs,<br><br>        vs.<br><br>META PLATFORMS, INC.,<br><br>                         Defendant. | Case No. 26-cv-1127<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Anthony Irving, Yaakov Strauss, and Santosh Kumar ("Plaintiffs"), by and through their undersigned counsel, allege the following for their complaint against Defendant Meta Platforms, Inc. ("Meta," "Defendant," or the "Company") upon knowledge as to themselves and their own actions, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to: (a) review of Meta's publicly disclosed policies, filings with the Securities and Exchange Commissions (the "SEC"), and other public statements; (b) review of media reports about the Company; (c) review of public filings and court orders in other litigation relating to the fraudulent scheme discussed herein (the "JYD Scheme"); and (d) discussions with, surveys of, and review of documents and information provided by more than 100 victims of the JYD Scheme (the "JYD Victim Group").

## I.     **INTRODUCTION**

1.     This case arises from Meta's role in enabling, facilitating, and materially contributing to a stock manipulation scheme that used advertisements created by Meta and distributed through the Company's Facebook and Instagram social media platforms, and its WhatsApp messaging service, to extract millions of dollars from unsuspecting victims.

2.     Meta's core business is selling its advertising services, which include generating online advertisements and targeting them to Facebook and Instagram users based on proprietary data that Meta collects regarding each user's interests and activities both within the Facebook and Instagram platforms and on devices linked to the user's social media accounts.

3.     Meta creates and develops ads that target particular user groups based on a range of demographic characteristics (*e.g.*, geographic location, income, age, and ethnicity) and interests (*e.g.*, past engagement with content related to a particular activity or product), and optimizes the ads to increase the likelihood of engagement by the targeted users.

4.     Meta derives its primary revenue sources (billions of dollars) from advertising customers, a sizable portion of which includes scammers utilizing Meta's advanced generation and targeting technology to extract billions of dollars from Meta's users.

5.     Meta has long been aware of scam ads on its social media platforms, but it has avoided implementing technology, personnel, and processes to monitor, identify, and prevent scam ads. Instead, Meta has invested billions in developing generative artificial intelligence ("AI") tools that have only worsened the proliferation of fraudulent advertisements and enhanced their effectiveness by generating hundreds of variations of advertisements that are optimized to drive engagement by vulnerable users.

6.     Meta personnel have reported that the Company has not only turned a blind eye to the problem of scam ads, despite promising its users that it "does not allow" such ads and will "take action" when it is made aware of them, but knowingly courts business from scammers and has implemented measures to limit fraud reduction so as not to reduce revenue from such sources.

7.     Among the multitude of scam ads on Meta platforms are investment scams, with scammers impersonating celebrities, well-known investors, and legitimate financial advisory firms to

lure unsuspecting users into fraudulent schemes. Meta knows that the advertisers have no affiliation whatsoever with the famous people and firms represented, yet the Company permits millions of those ads across its platforms every day and develops millions of variations of them through its suite of advertising tools.

8.    Meta has been alerted numerous times to such investment scams through complaints by the people and firms being impersonated (which Meta has ignored), lawsuits filed by victims in Japan and the government of Australia, notices issued by governmental and self-regulatory organizations, and its own internal reporting. Yet Meta not only has allowed investment scam ads to proliferate, it has materially contributed to creating those ads and maximizing their reach and effectiveness.

9.    Plaintiffs in this action were victimized by one such investment scam, perpetrated by an organized criminal network operating out of China.

10.    Meta's advertising tools enabled the scammers to target victims with hundreds of advertisements for supposed investment clubs associated with celebrities, well-known investors, and advisory firms, none of which were Meta ad customers.

11.    Victims who clicked on the ads were then added to WhatsApp groups where the scammers posed as financial advisors and encouraged victims to purchase securities whose prices the scammers were manipulating so that their co-conspirators could unload their holdings at inflated prices, reaping massive, illicit profits.

12.    Beginning on or around March 21, 2025, the scammers recommended that Plaintiffs and other victims who responded to their Meta advertisements purchase shares of Jayud Global Logistics Ltd. ("JYD"), a Chinese stock listed on NASDAQ and trading under the ticker JYD.

13.    Operating through WhatsApp groups, the scammers instructed victims to make purchases of JYD shares at specified price points based on claims that JYD was poised for strong growth and soon would announce a strategic transaction that would boost its share price.

14.    In reality, the scammers were using the victims' purchases to artificially inflate JYD's share price and create a market for their co-conspirators to unload their holdings of 50 million shares

of JYD stock, which they had acquired at deeply discounted prices through a non-bona fide offering in December 2024.

15.    The scammers' market manipulation scheme worked, with victims' purchases driving JYD's stock price to more than double in a matter of weeks to a high of nearly $8.00 per share on April 1, 2025.

16.    With the "pump" having taken effect, the scammers and their conspirators then turned to the "dump" phase of their scam. Beginning in after-hours trading on April 1 and continuing through the trading day on April 2, 2025, the scammers and their co-conspirators sold more than 45 million shares at artificially inflated prices, causing JYD's stock to lose over 95% of its value.

17.    As a result of the stock collapse, Plaintiffs and other victims of the scheme lost millions of dollars they had invested in JYD shares. Plaintiffs estimate total losses to the proposed Class to be in excess of $500 million.

18.    Meta's advertising tools were the primary means through which the scheme was implemented, which led to Plaintiffs and other victims interacting with and being victimized by the scammers.

19.    The JYD scammers could not have accomplished their scheme without Meta's proprietary tools, data, and active assistance. Meta's advertising tools developed and determined the content and appearance of the ads used to perpetrate the scam. Meta's tools directed the ads to particular Facebook and Instagram users based on data (only known to Meta) indicating the users would be vulnerable to the ads, including by targeting users who demonstrated an interest in investing. Meta's tools also optimized the particular ads targeted to each user, including by showing users ads featuring celebrities or investors of their same race or ethnicity in order to increase the appeal of the ads.

20.    This action seeks to hold Meta liable for its role in enabling, facilitating, and materially contributing to the JYD Scheme, including, in particular, its central role in generating the scam ads that lured Plaintiffs and other victims into the scammers' trap. Plaintiffs seek (i) monetary damages on behalf of themselves and a proposed Class comprised of other victims of the JYD Scheme; (ii) disgorgement of Meta's unjust profits from fraudulent advertisements used in connection with the

JYD Scheme; and (iii) injunctive relief requiring Meta to implement appropriate advertising review and monitoring procedures to prevent the creation of investment scam ads through Meta's advertising tools.

## II.   THE PARTIES

21.    Plaintiff Anthony Irving resides in Herts, United Kingdom and recently retired after a more-than-50-year career. Plaintiff Irving was lured into the JYD Scheme through Facebook advertisements on or around March 3, 2025. The ads led him to join a WhatsApp group in which scammers impersonated representatives of Aureus Asset Management. Plaintiff Irving began purchasing shares of JYD on behalf of himself and his grandchildren on March 25, 2025, and they collectively lost more than $339,000 in the scheme, with the dump coinciding with the first day of his retirement.

22.    Plaintiff Yaakov Strauss is a real estate professional who resides in California. Plaintiff Strauss was lured into the JYD Scheme through Facebook advertisements on or around February 14, 2025, which led him to join an investment group on WhatsApp in which scammers impersonated representatives of Disciplina Group LLC. Plaintiff Strauss purchased shares of JYD beginning on March 26, 2025 and lost more than $300,000 in the scheme.

23.    Plaintiff Santosh Kumar is a technology professional who resides in California. Plaintiff Kumar was lured into the JYD Scheme through Instagram advertisements on or around February 18, 2025, which led him to join the "Bull Market Investor Group1" on WhatsApp. Plaintiff Kumar purchased shares of JYD beginning on March 26, 2025 on behalf of himself and his wife, and they together lost more than $850,000 in the scheme.

24.    Defendant Meta Platforms, Inc. is a Delaware corporation which has its principal place of business in Menlo Park, California.

25.    Meta is owner and operator of the Facebook and Instagram social media platforms. Facebook is the world's largest social media platform with more than 3 billion monthly active users, while Instagram is the third largest platform with 2 billion monthly active users.

26.    Meta also operates the WhatsApp messaging service, which is billed as an end-to-end encrypted service allowing for private communications among its users.

III.    **JURISDICTION AND VENUE**

27.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

      a.    This action is a putative class action filed under Fed. R. Civ. P. 23, 28 U.S.C. § 1332(d)(1)(B);

      b.    The number of members of the Class is greater than 100 because, on information and belief, the Class consists of thousands of members, including the more than 100 members of the JYD Victim Group, 28 U.S.C. § 1332(d)(5)(A);

      c.    The amount in controversy is in excess of $5,000,000 because the Class suffered damages of more than $500,000,000, including more than $9,000,000 in monetary damages suffered by the JYD Victim Group, 28 U.S.C. § 1332(d)(2); and

      d.    CAFA's minimal diversity requirement is satisfied because Meta is a citizen of California, where it maintains its principal place of business, and of Delaware, where it is incorporated, and at least one member of the Class is a citizen of a different state because and many members of the JYD Victim Group live in states other than California or Delaware (including Arizona, Florida, Kentucky, Nevada, New Jersey, New York, Utah, Washington, and Wisconsin) and in foreign countries, 28 U.S.C. § 1332(d)(2)(A).

28.    Venue is proper in this judicial district under 28 U.S.C. §1391(b) and (c)(2) because Defendant maintains its principal place of business in this District and because a substantial part of the acts and omissions giving rise to this action occurred in this District.

29.    This Court has jurisdiction over Defendant because it has its principal place of business in California, transacts a substantial amount of business in California, has substantial ties to California, and/or is a citizen or resident of California or otherwise maintains sufficient minimum contacts with California to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

30.     This Court also has jurisdiction over Defendant because Meta's Terms of Service ("ToS") for its social media platforms include a forum selection clause in favor of this Court.[1] The ToS require that all claims to which Meta is a party "shall be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Meta Profits from Scam Ads

31.     Meta generates substantially all of its revenues from selling advertising to businesses seeking to market their products and services to users of Meta's social media platforms. In its most recently reported fiscal year ended December 31, 2024, Meta collected approximately $160,633,000,000 in advertising revenues, representing greater than 97% of the Company's' total revenues ($164,501,000,000).

32.     Meta collects vast amounts of data from each Facebook and Instagram user, which is only known to Meta and allows the Company to sell targeted advertisements to millions of advertisers.

33.     Meta collects user data from each user's activity on Facebook or Instagram, such as the content the user posts and the content the user likes or otherwise interacts with. Meta also collects data from the user's activity outside of Meta's platforms, including searches the user runs through Google or other search engines, websites the user visits, and purchases the user makes on devices linked to their Facebook or Instagram account.

34.     Meta's ability to target ads to Facebook and Instagram users based on the data collected is a key selling point to advertisers. As Meta CEO Mark Zuckerberg testified before the Senate's Commerce and Judiciary Committees on April 10, 2018:

> What we allow is for advertisers to tell us who they want to reach, and then we do the placement. So, if an advertiser comes to us and says, 'All right, I am a ski shop and I want to sell skis to women,' then we might have some sense, because people shared skiing-related content,

---

[1] Meta's Terms of Service as of January 1, 2025 are attached hereto as Exhibit A.

or said they were interested in that, they shared whether they're a woman, **and then we can show the ads to the right people** . . ."[2]

35.    Meta acknowledged in its most recent Form 10-K filed with the SEC that improvements to its "ad targeting and measurement tools" had driven an increase in the prices paid by advertisers, and it identified regulatory developments and changes in user behavior that may limit the use and effectiveness of those tools as a key risk factor that could impact the Company's future performance.

36.    In addition to targeting third-party advertisements to users of the Facebook and Instagram social media platforms, Meta increasingly has transitioned its business model to include the creation and development of ads for its advertising customers, with the objective of filling the role of a traditional advertising agency for many of the Company's customers.

37.    Meta's advertising services include a suite of tools, enhanced by AI, that generate and optimize advertisements for use on Facebook and Instagram. According to Meta, these tools have the ability to generate thousands of variations of potential ads for the Company's advertising customers.

38.    Meta's advertising tools include "Ads Manager," which the Company touts as "an all-in-one tool for creating ads, managing when and where they'll run, and tracking how well your campaigns are performing towards your marketing goals."[3]

39.    As Meta well knows, not all advertisers operate legitimate businesses, and fraudsters increasingly have learned to exploit Meta's ad development and targeting capabilities to put deceptive, false, and misleading ads in front of the users calculated to be the most likely to respond to those ads and be lured into bait-and-switch and other fraudulent schemes.

---

[2] *See* Joint Full Committee Hearing, *Facebook, Social Media Privacy, and the Use and Abuse of Data*, Committee on the Judiciary (Apr. 10, 2018, 2:15 PM), https://www.govinfo.gov/content/pkg/CHRG-115shrg37801/html/CHRG-115shrg37801.htm (last visited Feb. 4, 2026). Unless otherwise indicated, all emphasis herein is added.

[3] *See* https://www.facebook.com/business/tools/ads-manager (last visited Feb. 4, 2026).

CLASS ACTION COMPLAINT

40.     According to a recent report in *The Wall Street Journal*, an internal analysis by Meta from 2022 found that 70% of newly active advertisers on Meta's platforms were promoting scams, illicit goods or "low quality" products.[4]

41.     In October 2020, the Federal Trade Commission ("FTC") reported that about 94% of the complaints it collected concerning online shopping fraud on social media identified Facebook or Instagram as the source.

42.     While scam ads cause untold financial harm to Meta's customers, Meta has little incentive to intervene because it receives revenues regardless of whether the ad is part of a scam.[5]

43.     According to the recent *Wall Street Journal* article, current and former employees say Meta is reluctant to create impediments for ad-buying clients in view of the Company's dependence on advertising for substantially all of its revenues.[6]

44.     The article further reports that Meta refuses to remove advertisers even where they demonstrate a history of scamming. For example, an internal company document from late 2024 shows that Meta will allow an advertiser to accrue between 8 and 32 automated "strikes" for financial fraud before it bans their accounts.[7]

45.     The article also reports that Meta has deprioritized scam enforcement in recent years, including abandoning plans for advertiser verification requirements like those it mandates for political ads and failing to invest in automated tools or the personnel needed to effectively identify and remove scam ads.[8]

---

[4] Jeff Horwitz & Angel Au-Yeung, *Meta Battles an 'Epidemic of Scams' as Criminals Flood Instagram and Facebook*, WALL ST. J., May 15, 2025, https://www.wsj.com/tech/meta-fraud-facebook-instagram-813363c8?reflink=desktopwebshare_permalink

[5] Federal Trade Commission, *FTC Data Shows Big Jump in Consumer Reports about Scams Originating on Social Media*, Oct. 21, 2020, https://www.ftc.gov/news-events/news/press-releases/2020/10/ftc-data-shows-big-jump-consumer-reports-about-scams-originating-social-media

[6] Jeff Horwitz & Angel Au-Yeung, *Meta Battles an 'Epidemic of Scams' as Criminals Flood Instagram and Facebook*, WALL ST. J., May 15, 2025, https://www.wsj.com/tech/meta-fraud-facebook-instagram-813363c8?reflink=desktopwebshare_permalink

[7] *Id.*

[8] *Id.*

46.     A recent article published by Reuters cites internal Meta documents from December 2024 acknowledging that "the company shows its platforms' users an estimated 15 billion 'higher risk' scam advertisements—those that show clear signs of being fraudulent—every day."[9]

47.     The Reuters article further reports that Meta's internal ad review system applies a lenient standard, banning advertisers only if Meta's automated tools determine with at least 95% certainty that they are committing fraud. Further, a small advertiser will not be removed until it has been flagged for promoting financial fraud at least eight times, while so-called "High Value Accounts"—*i.e.*, those that generate more ad revenue for Meta—can accumulate ***more than 500 strikes*** without Meta shutting them down.[10]

48.     Otherwise, even if Meta believes the advertiser is likely a scammer, it allows the advertiser to remain active, but charges higher ad rates—essentially allowing scammers to pay a premium for the privilege of targeting Facebook and Instagram users with scam ads.[11]

49.     As a coalition of more than 40 State Attorneys General, including California Attorney General Rob Bonta, put it bluntly in a recent letter calling on Meta to improve its processes to identify scam ads: "***The ease with which these scams can be initiated and disseminated on [Metas'] platforms, targeting our most vulnerable population, is alarming*** . . . If Meta is unable to implement a more effective process, then it should just stop running investment advertisements as a category."[12]

---

[9] Jeff Horwitz, *Meta Is Earning a Fortune on a Deluge of Fraudulent Ads, Documents Show*, REUTERS, Nov. 6, 2025, https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

[10] *Id.*

[11] *Id.*

[12] Letter from National Association of Attorneys General to Jennifer Gillian Newstead, Esq., Chief Legal Officer of Meta Platforms, Inc. (June 5, 2025) https://www.naag.org/wp-content/uploads/2025/06/Letter-to-Meta-re-Scam-Investments-_FINAL.pdf (emphasis added). *See also* https://oag.ca.gov/news/press-releases/attorney-general-bonta-urges-immediate-action-meta-prevent-investment-scam.

50.     Chinese vendors have become particularly lucrative for Meta, accounting for approximately 11.2% of revenues in 2024, up from 6.4% in 2021.[13] According to Meta's 2024 10-K, China revenue was $18.35 billion, versus $7.40 billion in 2022.

51.     These ads come at a cost, however, as Chinese ads are particularly prone to be connected to fraudulent activities. According to news reports, one internal Meta study showed that nearly 30% of the advertisements placed by China-based advertisers—estimated to account for $2.6 billion in 2020 ad sales alone—violated at least one of Facebook's own ad policies.[14]

52.     Nevertheless, Meta's business development strategies have included fostering relationships with Chinese scammers and deliberately ignoring their misconduct. Meta representatives have delivered presentations to conferences heavily attended by known fraudsters, socialized with those scam perpetrators, and driven business by encouraging known scammers to continue to purchase Meta ads.

53.     Sources familiar with Meta's ad policies have told journalists that Meta employees are directed to ignore sponsored fraudulent advertisements and violations of the Company's internal policies, particularly from Chinese-affiliated advertisers. In one report on Meta's profits from scams, an internal source reported: "We're not told in the exact words, but [the idea is to] look the other way. It's 'Oh, that's just China being China. It is what it is. We want China revenue.'"[15]

54.     In response to internal concerns regarding the problem of scam ads from China, Meta implemented a China-focused anti-scam team and a freeze on granting new Chinese ad agencies access to its platforms in 2024, but the effort was short-lived. In late 2024, Chief Executive Officer Mark Zuckerberg reviewed the initiatives as part of a Company drive to increase revenue. Following

---

[13]     *See*    https://stockdividendscreener.com/information-technology/meta-revenue-breakdown-by-region-and-user-geography/#D1; *see also* Paul Mozur & Lin Qiqing, *How Facebook's Tiny China Sales Floor Helps Generate Big Ad Money*, N.Y. TIMES, Feb. 7, 2019, https://www.nytimes.com/2019/02/07/technology/facebook-china-internet.html.

[14]     Craig Silverman & Ryan Mac, *Facebook Gets Paid*, BUZZFEED NEWS, Dec. 10, 2020, https://www.buzzfeednews.com/article/craigsilverman/facebook-ad-scams-revenue-china-tiktok-vietnam.

[15]     Craig Silverman & Ryan Mac, *Facebook Gets Paid*, BUZZFEED NEWS, Dec. 10, 2020, https://www.buzzfeednews.com/article/craigsilverman/facebook-ad-scams-revenue-china-tiktok-vietnam

1    Zuckerberg's feedback, Meta lifted the freeze and ordered the team to abandon its efforts. The team

2    complied, and scam ads from China subsequently surged.[16]

3        55.    Instead of implementing procedures to protect Facebook and Instagram users from

4    scam ads, Meta manipulated its public Ad Library to make it more difficult for external parties to

5    determine the extent of scam ads on its platforms. Internal company documents reveal that Meta took

6    steps to make problematic content "not findable" by "regulators, investors and journalists" in response

7    to scrutiny from Japanese regulators. These steps included deleting ads featuring particular celebrities

8    and keywords Meta knew were a focus for Japanese regulators, in order to reduce the "prevalence

9    perception" of scam ads resulting from searches of the Ad Library. Meta then added this tactic to its

10   "general global playbook" to combat regulatory scrutiny in other markets, including the United States,

11   in an effort to fend off regulatory reforms that would jeopardize Meta's revenue from scam ads.[17]

12       **B.    Meta Is Aware of Investment Fraud on Its Platforms**

13       56.    In February 2024, nine victims of a Facebook investment-fraud scam sent a certified

14   letter alerting Meta that its platforms were being used to perpetrate investment scams.[18] The letter

15   detailed 21 scam ads featuring finance leaders including Bill Ackman, Cathie Wood, and Steve Cohen

16   and reported that the ads linked to WhatsApp groups, where scammers "promise[d] unrealistic

17   returns, and misleading investment opportunities, ultimately turning into a pump-and-dump scheme,

18   and leading to significant losses for unsuspecting individuals." The victims alerted Meta that "[b]y

19   exploiting the trust placed in [its] platform, [the scammers] can reach a wide audience and lure

20   unsuspecting individuals into fraudulent investment schemes, resulting in devastating consequences

21   for those who are duped."

22

23   _____

24   [16] Jeff Horwitz, *Meta Tolerates Rampant Ad Fraud from China to Safeguard Billions in Revenue*
     REUTERS, Dec. 15, 2025, https://www.reuters.com/investigations/meta-tolerates-rampant-ad-fraud-
     china-safeguard-billions-revenue-2025-12-15/.

25   [17] Jeff Horwitz, *Meta Created 'Playbook' to Fend Off Pressures to Crack Down on Scammers,*
26   *Documents Show*, REUTERS, Dec. 31, 2025, https://www.reuters.com/investigations/meta-created-
     playbook-fend-off-pressure-crack-down-scammers-show-2025-12-31/.

27   [18] Randall Smith, *Phony Billionaires on Facebook are Scamming Americans Out of their Life Savings*,
28   WALL ST. J., March 15, 2024, https://www.wsj.com/tech/fake-bill-ackman-cathie-wood-scam-
     a8df6ce7 ("A group of nine scam victims sent a letter Feb. 28 to Facebook detailing 21 times scam
     ads of Ackman, Cohen or Wood were reported to Facebook in January and February.").

57.     The victims presciently warned, "it is highly likely that [the scammers] will deploy the same plot to short-sell [more] stocks to their investors" and "the short-selling will take place soon." They implored Meta to "take immediate and decisive action to address this urgent issue," including "[i]mplement[ing] stricter screening procedures for financial advertisements to prevent similar scams from proliferating on the platform in the future."

58.     The victims also urged Meta to improve the process for reviewing and responding to user reports of scam ads because the current process was "ineffective." The letter attached evidence of numerous investment scam ads that victims had reported to Meta but that the Company had not removed despite plainly violating its advertising policies.

59.     The February 2024 letter was not the first or the only warning Meta has received about the prevalence of fraudulent investment schemes on its platforms, including advertisements developed through its advertising tools featuring unlicensed images of celebrities and financial advisors purportedly touting individual investments and promising various "get-rich-quick" schemes.

60.     As early as April 2018, British personal finance expert Martin Lewis sued Meta after his name and likeness were used by scammers advertising get-rich-quick schemes on Facebook.[19]

61.     In March 2022, the Australian Competition and Consumer Commission filed a lawsuit alleging that Meta aided and abetted investment scam ads featuring prominent Australians claiming to have profited from cryptocurrency investments, later telling the court that evidence revealed that Meta had been aware of the practice since at least January 2018.[20]

---

[19] *British finance expert sues Facebook over scam ads featuring his name and face*, CANADIAN BROADCASTING CORPORATION, Apr. 23, 2018, https://www.cbc.ca/radio/asithappens/as-it-happens-monday-full-episode-1.4631377/british-finance-expert-sues-facebook-over-scam-ads-featuring-his-name-and-face-1.4631381

[20] Amy Bainbridge, *Facebook, Instagram parent company Meta sued over scam ads featuring Dick Smith, David Koch*, AUSTRALIA BROADCASTING CORPORATION, March 17, 2020, https://www.abc.net.au/news/2022-03-18/facebook-instagram-meta-sued-over-fake-ads/100920146; Josh Taylor, *Half of crypto ads on Facebook are scams or violate Meta's policies, consumer regulator alleges*, THE GUARDIAN, Aug. 14, 2024, https://www.theguardian.com/technology/article/2024/aug/15/crypto-ad-scams-facebook-meta-accc-court-case

CLASS ACTION COMPLAINT

62.     In January 2024, FINRA issued a statement that it had "seen a recent significant spike in investor complaints resulting from recommendations made by fraudulent 'investment groups' promoted through social media."[21]

63.     In April 2024, Barclays warned that investment scams had risen "by nearly a third" in the previous 12 months, "with 6 in 10 falling victim on social media."[22]

64.     In May 2024, *Financial Times* reported on the "surge" of "social media investment scams." The article explained how one type of "online fraud consists of scammers using images of trusted public figures or celebrities to convince people to move their money into fake funds or non-existent investments."[23]

65.     Also in May 2024, *The Wall Street Journal* reported on the trend, describing how victims were directed to advertisements that pitched "WhatsApp groups, often moderated by [] fictitious people" and featured images of "titans of finance" pitching opportunities for lucrative returns.[24]

66.     In June 2024, Capital Wealth Planning, LLC, an investment advisory firm in Naples, Florida, discovered that parties were impersonating its Chief Executive Officer, Kevin Simpson, on WhatsApp. The firm alerted local law enforcement, the FBI, and the SEC, and also contacted Meta to request that the fraudulent posts be removed.[25]

---

[21] *Investor Alert: Social Media "Investment Group" Imposter Scams on the Rise*, YAHOO! FINANCE, Jan. 17, 2024, https://finance.yahoo.com/news/investor-alert-social-media-investment-100000532.html

[22] *Barclays urges action as investment scams rise by 29 per cent – with 6 in 10 falling victim on social media*, BARCLAYS, April 17, 2024, https://home.barclays/insights-old/2024/04/barclays-urges-action-as-investment-scams-rise-by-29-per-cent---/

[23] *Advisers Worry as Social Media Investment Scams Surge*, FINANCIAL TIMES, May 17, 2024, https://www.ft.com/content/6f5055fc-08f6-4d83-9b66-414f7f09971e

[24] Randall Smith, *Phony Billionaires on Facebook are Scamming Americans Out of their Life Savings*, WALL ST. J., March 15, 2024, https://www.wsj.com/tech/fake-bill-ackman-cathie-wood-scam-a8df6ce7

[25] *Unknown Rogue Elements Impersonate Capital Wealth Planning, LLC and its Founder and Chief Executive Officer, Kevin Simpson*, CAPITAL WEALTH PLANNING, June 7, 2024, https://capitalwealthplanning.com/press-release-6-7-2024/

67.     In September 2024, Meta itself acknowledged that "[s]cammers often use public figures and celebrities' images to bait people into engaging with scam content, including ads. This type of scam can harm both those who are victimized by the unauthorized use of their likeness, as well as members of the public who are deceived by scam 'endorsements.'"[26]

68.     In October 2024, Japanese plaintiffs filed suit against Meta alleging it had facilitated investment scams on its platforms through fraudulent advertisements, often "featuring famous entrepreneurs."[27]

69.     Then, beginning on or around January 30, 2025, victims of another investment scam— this one involving securities of China Liberal Education Holdings, Ltd. ("CLEU")—contacted Meta regarding scam ads on Facebook and Instagram. Victims of the CLEU scam reported dozens of ads that, just like the ads previously reported in the February 2024 letter, impersonated celebrities, well-known investors, and legitimate financial advisory firms, and invited users to join purported investment clubs, operated through WhatsApp, with promises of tremendous investment returns. Victims of the CLEU scam specifically advised Meta that the ads had been used to carry out a pump-and-dump scheme, but Meta again refused to take them down.

70.     Notwithstanding these clear, specific, and repeated warnings—including by two victim groups—and the significant risks to Facebook and Instagram users, Meta failed to address the problem of investment scam ads on its platforms, thereby enabling the JYD scammers to carry out their scheme and allowing virtually identical scams to be perpetrated for more than a dozen other securities during 2025.

**C.     Scammers Rely on Meta-Generated Ads to Carry Out the JYD Scheme**

71.     The JYD scammers first targeted potential victims with ads generated by Meta's advertising tools and deployed on Facebook and Instagram. These scam advertisements promoted

---

[26] *Testing    New    Ways    to    Combat    Scams*,    Meta, https://www.meta.com/help/policies/494835429957019/

[27] Karin Kaneko, *Meta faces Japan lawsuits over fake ads linked to investment fraud*, The Japan Times, Oct. 29, 2024, https://www.japantimes.co.jp/news/2024/10/29/japan/crime-legal/investment-fraud-meta/

CLASS ACTION COMPLAINT

fake investment clubs, but in reality were vehicles for the scammers to execute a stock manipulation scheme.

72.     Some of the ads featured celebrities. For example, several members of the JYD Victim Group were targeted with ads featuring Kevin O'Leary, a/k/a "Mr. Wonderful" from Shark Tank, while others were targeted with ads featuring Jim Cramer of CNBC's Mad Money.

73.     Other ads featured well-known investors. For example, several members of the group (including Plaintiff Kumar) were targeted with ads featuring Savita Subramanian, Head of U.S. Equity and Quantitative Strategy at Bank of America Merrill Lynch. Plaintiff Irving was targeted with ads featuring Karen Finerman, co-Founder and President of Metropolitan Capital Advisors and a panelist on CNBC's Fast Money. Still other ads featured Tom Lee, a frequent CNBC commentator and the co-founder and Head of Research for the Wall Street firm FundStrat Global Advisors; famed hedge fund managers Bill Ackman and Ray Dalio; and personal finance expert and private investor Dave Ramsey.

74.     Other members of the JYD Victim Group were targeted with ads that appeared to be from reputable financial advisory firms whose likenesses, branding, and other information had been appropriated and exploited by the scammers. For example, several members were targeted with ads purporting to be for Colin Moran of Abdiel Capital Advisors, an investment manager based in New York City, whose representatives also were impersonated in many of the WhatsApp groups used to promote JYD.

75.     As to all ads relying on the endorsement of celebrities and real-world investment firms, Meta knew at the time (based on its customer records) that the ad purchasers had **no actual affiliation with any of the persons or firms represented**, and therefore the ads were fraudulent on their face.

76.     The ads, generated and optimized through Meta's advertising tools, told targeted Facebook and Instagram users that investment club members would have access to stock recommendations from the featured financial advisors and promised that the recommendations would result in tremendous returns.

77.     For example, an ad for the "Lakshmi Finance Center" featuring Savita Subramanian promoted an investment group offering "[w]eekly sharing of 2-3 featured stocks." The ad highlighted

a stock that was expected to increase from $6 per share to $18 in 30 days, a one-month return of 200%, with a 60-day price target of $33—a 450% return in just two months.



78. Another ad for the Lakshmi Finance Center offered "1-5 strong stock recommendations" "every day," promising that investors could "easily get 30%+ returns."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    79.    Facebook and Instagram users who clicked on the ads either were automatically added

18 into, or were invited to click an embedded link to join, a private WhatsApp group.

19    80.    Within the WhatsApp group, scammers posed as representatives of the featured

20 advisors and/or legitimate financial advisory firms, and communicated with users regarding the club's

21 operations, including the timing of stock recommendations.

22    81.    For example, the purported financial advisor representatives in one group

23 communicated that they would recommend 1-2 short-term high-quality stocks week, with a holding

24 period of 10-15 days and expected returns of 15%-25%.  In addition, from time to time, they would

25 recommend "VIP institutional stocks" with a holding period of approximately 30 trading days and

26 expected returns of more than 160%.

27

28

82.    The scammers also created dozens of fake accounts, posing as club members within the WhatsApp group and touting their prior successes following the advisors' recommendations, which created the appearance of legitimacy and reliability that helped lure victims into the scheme.

83.    Users were offered a free trial period (typically 60 to 90 days) to try out the investment club, after which they would be charged commissions based on the returns they realized.

84.    Then, over a period of weeks or months, the scammers communicated with users in the WhatsApp group, providing investment recommendations and friendly communications to build trust.

85.    Beginning on or around March 21, 2025, and increasingly between March 25 and 27, the scammers, posing as financial advisor representatives, began recommending that WhatsApp group members purchase shares of JYD as one of their "VIP institutional stock" recommendations. They predicted that the price of JYD stock would appreciate significantly in the near future, and they promised to reimburse investors for losses on the JYD investment.

86.    The scammers supported their recommendations with purported analysis of JYD business capabilities and prospects, including its purportedly strong reputation in the international logistics market, which the scammers claimed was poised for rapid growth. The scammers also claimed that JYD was in the process of negotiating a strategic partnership or business combination with U.S.-based logistics company, Matson, Inc. (or MATX), which they projected would lead to 36% profit growth, fueling further increases in the JYD's stock price.

87.    The scammers pressured victims to buy quickly, claiming that waiting even a few days would cause them to miss out on the stock's rise.

88.    The scammers continued to recommend additional purchases of JYD at higher price points over the coming days, pressuring victims to liquidate other investments, move cash from other accounts, and even take out loans to fund their purchases.

89.    Because hundreds, if not thousands, of victims across hundreds of WhatsApp groups were making purchases, JYD's stock price rose rapidly. With the promised returns seemingly materializing, victims were falsely reassured and continued to make additional purchases, further inflating the stock price.

90.    JYD's stock price skyrocketed, more than doubling in just two weeks to close at $7.97 per share on April 1, 2025.

91.    The stock price collapsed during after-hours trading on April 1, as the scammers and their co-conspirators liquidated their JYD holdings. Stop-loos orders failed to execute because the trades were executed after hours and as a result of rapid price gaps and thin liquidity; the stock simply gapped down through stop-loss triggers, leaving investors unable to exit positions.

92.    By the time the markets re-opened on April 2, the stock was already down 79%, and by the end of the day, it had lost more than 95% of its value, trading as low as $0.35 per share. Approximately 45.8 million JYD shares were included in the sell-off, representing virtually all of the 50 million shares the scammers and their co-conspirators had received in the December 2024 offering.

**D.    The JYD Scheme's Devastating Impact on Victims**

93.    The JYD Scheme caused significant financial harm to its victims. The more than 100 members of the JYD Victim Group collectively suffered losses of more than $9 million, and Plaintiffs estimate that the overall loss to the Class was in excess of $500 million.

94.    In addition to the JYD Scheme's financial impact, victims have suffered emotional, psychological, social, and physical distress. Members of the JYD Victim Group report experiencing depression, anxiety, insomnia, and strained personal relationships, with some having thoughts of self-harm and even suicide.

95.    Members of the JYD Victim Group include a newly divorced mother of three who was targeted with ads for an investment training program while she was dealing with the end of her 27-year marriage and struggling to find her footing and re-enter the workforce after 20 years as a stay-at-home mom. She joined the program because she believed it was a chance to build a stable future for herself and her children, but she was left worse than before. She reports feeling ashamed and humiliated; she has suffered from panic attacks and insomnia; and when she does manage to sleep, she awakes feeling overwhelmed by hopelessness.

96.    Another victim is a 70-year-old man who is the sole caretaker for his wife of 48 years, who has dementia. The JYD Scheme depleted the assets he had saved through a 40-year career as a military combat veteran and business professional. Previously social and active, the Scheme has left

him withdrawn, cynical, and short-tempered. He worries about how he will provide the care his wife needs because of the strain the losses have created both financially and emotionally.

97.     Other victims include parents who lost money they had saved for their children's college educations. One such victim reports experiencing a "suffocating" feeling of guilt, fearing his children's future has been stolen.

**E.     Meta Created and Permitted Scam Ads in Violation of Its Stated Policies and Contractual Obligations**

98.     Meta's agreement with its users of its social media platforms explicitly prohibits—and states that Meta "do[es] not allow" and will "take action" to prevent and remove—ads like those used by the JYD scammers, but Meta failed to comply with its contractual obligations.

99.     The ToS constitute an agreement between Meta and the users of its social media platforms, including Plaintiffs and other members of the Class, pursuant to which (a) the users are given the right to use Meta's social media platforms in exchange for (b) Meta's right to "show [them] ads that may be relevant to" the user.[28]

100.     The ToS expressly acknowledge that they "constitute an agreement between [the user] and Meta."[29]

101.     Section 1 of the ToS sets forth "The services [Meta] provide[s]." One of those services is "Promot[ing] the safety, security, and integrity of our services, combat[ting] harmful conduct and keep[ing] our community of users safe." In that regard, Meta represents that it:

> employ[s] dedicated teams around the world, work[s] with external service providers, partners and other relevant entities and develop[s] advanced technical systems to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community, ***including to respond to user reports of potentially violating content***. If we learn

---

[28] *See* Ex. A § 2.
[29] *Id.* at 1.

1    of content or conduct like this, we may **take appropriate action**

2    based on our assessment that may include – notifying you, offering

3    help, **removing content**, removing or restricting access to certain

4    features, **disabling an account**, or contacting law enforcement.[30]

5    102.    Meta's ToS incorporate additional policies, including "Community Standards" and

6    "Advertising Policies" (also referred to as "Advertising Standards").[31]

7    103.    Meta states that the "policies define what is and isn't allowed on Meta's technologies.

8    *If content goes against our policies, we take action on it*."[32]

9    104.    In terms of "what . . . isn't allowed" on the Company's platforms, Meta's Community

10    Standards distinguish between two categories of content: (i) content that is strictly prohibited (*i.e.*,

11    "Content that's **not allowed**") and (ii) content that may or may not be allowed under certain

12    circumstances (*i.e.*, "Content that requires additional information or context to enforce on, content

13    that is allowed with a warning screen or content that is allowed but can only be viewed by adults aged

14    18 and older.").[33]

15    105.    Meta's Community Standards include a standard on "Fraud, Scams, and Deceptive

16    Practices,"[34] which unequivocally states:

17    We **do not allow**: Content that attempts to scam or defraud users

18    and/or businesses by means of … [offering] investment

19    opportunities where returns on investment are guaranteed or risk-

20    free [or] investment opportunities where the opportunity is of a "get-

21    rich-quick" nature and/or claims that a small investment can be

22    turned into a large amount.[35]

23

24    [30] *See id.* §§ 1, 1.5.

25    [31] *See id.* § 5.

26    [32] https://transparency.meta.com/policies (last visited Feb. 4, 2026).

      [33] *See id.*

27    [34] The Community Standard on Fraud, Scams, and Deceptive Practices in effect during the first
      quarter of 2025 is attached hereto as Exhibit B.

28    [35] *See* Ex. B at 2-3.

106.    The same Community Standard on Fraud, Scams, and Deceptive Practices further purports to strictly prohibit content that "[a]ttempts to scam or defraud users by mispresenting the identity of the poster," including "falsely claiming to represent, or speak in the voice of, an established business or entity, in an attempt to scam or defraud."[36]

107.    Meta represents that it "remov[es] content and combat[s] behavior" that violates the Community Standard on Fraud, Scams, and Deceptive Practice, and that it has "the same policies around the world, for everyone on Facebook."[37]

108.    Meta's Advertising Standards incorporate the Community Standard on "Fraud, Scams and Deceptive Practices," stating that "Ads Must Comply" with that standard.[38]

109.    Meta also represents that it has established an "ad review system [to] review[] ads for violations of our policies." The system purportedly "starts automatically before ads begin running" and includes review of "the specific components of an ad, such as images, video, text and targeting information."[39]

110.    Based on the foregoing, Plaintiffs and other members of the Class were reasonably led to believe that Meta had systems in place to prevent, detect, and remove fraudulent ads. Absent such assurances, Plaintiffs and other members of the Class would not have consented to give Meta the right to target them with advertisements in exchange for their use of Facebook and Instagram.

111.    Nevertheless, Meta breached its contractual obligations by not only allowing ads by the JYD scammers but materially contributing to the developments of those ads through its tools and technology.

112.    Meta substantially assisted in the production of these ads through its advertising tools, as discussed below. Meta's involvement included the development, use, and manipulation of images, text, and other content that had the hallmarks of investment fraud specifically identified in the Community Standards. Although Meta used its technology to generate, enhance, and optimize that

---

[36] *Id.* at 4.

[37] *Id.* at 1, 11.

[38] https://transparency.meta.com/policies/ad-standards/ (last visited Feb. 4, 2026).

[39] *Id.*

content, it did not deploy technology to ensure the content complied with its Community Standards and Advertising Policies, despite representing to users that its ad review system would do exactly that.

113.    Meta's creation of ads including fraudulent investment content is particularly troubling in view of the strict regulations governing investment advisors and their advertising and the fact that Meta long has been aware that its social media platforms are being used to carry out investment scams as a result of the lawsuits and public information discussed above.

114.    Providers of investment advisory services are subject to a robust regulatory scheme, including requirements that they register with the SEC and FINRA. Investment advisor advertising is also strictly regulated, with FINRA Rule 2210 broadly prohibiting projections or predictions regarding investment performance. Nevertheless, Meta did not have any processes in place to verify that the JYD scammers were legitimate, FINRA-registered investment advisory firms or to confirm that the advertisements comply with applicable regulations. Meta failed to establish these processes even though it has the capacity to implement verification procedures and has done so for other types of advertising, including politics, elections, and social issues.[40]

115.    Moreover, while many of the ads featured celebrities and reputable investment firms, Meta did not take any action to confirm that the ads were authentic, despite evidence that verification requirements are effective in reducing scam ads.[41]

116.    Moreover, while many of the ads featured celebrities and reputable investment firms, Meta knew that its ad customers had no actual affiliation with those people or firms and took no action to either confirm that the ads were authentic or otherwise give notice to the persons and firms being impersonated. Although Meta has been repeatedly advised by investment firms over the preceding

---

[40] *See* https://transparency.meta.com/policies/ad-standards/SIEP-advertising/SIEP ("Any advertiser running ads about social issues, elections or politics who is located in or targeting people in designated countries must complete the authorization process required by Meta, except for news publishers identified by Meta.") (last visited Feb. 4, 2026).

[41] For example, when the government of Taiwan mandated verification of all advertisers, the stricter regulations brought down rates of scam ads involving investments by 96% and identity impersonation by 94%. *See* Jeff Horwitz, *Meta Created 'Playbook' to Fend Off Pressures to Crack Down on Scammers, Documents Show*, REUTERS, Dec. 31, 2025, https://www.reuters.com/investigations/meta-created-playbook-fend-off-pressure-crack-down-scammers-documents-show-2025-12-31/.

1    years that they are being impersonated by scammers, Meta does not remove the ads or implement

2    safeguards to prevent them from occurring, despite representing in the ToS that it would respond to

3    user reports and "take appropriate action."

4        117.    Indeed, Meta permitted the JYD scammers to continue to advertise ***for months*** even

5    after several members of the JYD Victim Group reported the fraudulent ads to Meta (often multiple

6    times) after the scheme was revealed, and despite the fact that Meta previously had been alerted to

7    virtually identical ads in February 2024 and again in early 2025 by victims of similar pump-and-dump

8    scams.

9        118.    Meta's failure to take down the ads, even when specifically brought to the Company's

10   attention by victims of the JYD and CLEU scams, enabled the scammers to continue their stock

11   market manipulation scheme, targeting other Chinese penny stock companies (such as Ostin

12   Technology Group Co., Ltd., Park Ha Biological Technology Co. Ltd., Pheton Holdings Ltd., Lixiang

13   Education Holding Co. Ltd., and Everbright Digital Holding Ltd.) and inflicting billions of dollars in

14   damages on thousands of additional victims.

15   **F.    Meta Materially Contributed to Developing the**
16         **Scam Ads and Targeting Vulnerable Users**

17       119.    Meta actively assisted the JYD scammers in luring victims into their scheme through

18   Meta's advertising tools, including Ads Manager, which created the ads and targeted them to specific

19   subsets of customers with known vulnerabilities with accuracy and efficiency that would have been

20   impossible without Meta's assistance.

21       120.    The scam ads were created and deployed using Meta's "Flexible Format," "Dynamic

22   Creative," and "Advantage+ Creative" tools within Ads Manager. These tools drive and determine

23   how the advertisements will appear. As a result, Meta's tools, not the advertiser, control the

24   appearance of the advertisements.

25       121.    When the Flexible Format tool is used, Meta "automatically optimizes" the ad and

26   "show[s] what [Meta] predicts is the best format" for the audience, meaning advertisers "don't need

27   to select different ad formats for different ad placements, as it'll be selected for [them] based on what

28

the ad delivery system determines people are most likely to respond to."[42] Meta exercises significant control over ads created through the Flexible Format tool, including selecting the specific images and other content that will be included, the layout, the platform (Facebook or Instagram), and how the ad will be displayed to a particular user (*e.g.*, in the user's feed, as a story, etc.).

122.    Similarly, the Dynamic Creative tool "takes multiple media, such as images and videos, and multiple ad components, such as images, videos, text, audio and calls-to-action, and then mixes and matches them in new ways to improve . . . ad performance. It allows [the advertiser] to automatically create personalized creative variations for each person who views [the] ad, with results that are scalable."[43]

123.    The Advantage+ Creative tool uses generative AI to apply "creative enhancements" to optimize advertisements. These "enhancements" include AI-generated text and images, which alter the contents of the advertisements to improve performance. The alterations may include modifications to images (such as applying different text overlays or modifying the image background), generating variations of the ad's text to target different audiences, and inserting "Call to Action" buttons, such as a link to purchase a product or join a WhatsApp group.[44]

124.    A December 2025 Reuters report details how Meta's advertising tools, including Advantage+, generate original advertisements that expand upon, and deviate from, the content initially provided by the advertiser.[45]

125.    A Reuters reporter sought to create an ad asking Facebook and Instagram users if they were "interested in making 10% weekly returns," implying an annualized rate of 14,000%, in

---

[42] *See* https://www.facebook.com/business/help/835561738423867 (last visited Feb. 4, 2026).

[43] The description of the Dynamic Creative Tool as it appeared on February 1, 2025 is attached hereto as Exhibit C. Meta subsequently revised the description of the tool. *See* https://www.facebook.com/business/help/170372403538781?id=244556379685063&ref=search_ne (last visited Jan. 18, 2026).

[44] *See* https://www.facebook.com/business/help/297506218282224?id=649869995454285 (last visited Feb. 4, 2026); *see also* https://www.facebook.com/business/help/180641596861873 (last visited Feb. 4, 2026).

[45] Jeff Horwitz, *Meta's "Trusted Experts" helped me run scam ads on Facebook and Instagram*, Reuters, Dec. 15, 2025, https://www.reuters.com/investigations/metas-trusted-experts-helped-me-run-scam-ads-facebook-instagram-2025-12-15/.

violation of Meta's prohibition against ads for get-rich-quick schemes. Meta's Advantage+ tool created numerous versions of the ad featuring new visuals and text, not provided by the reporter, including AI-generated people of different ethnicities, a sampling of which are shown below.[46]



126.   Meta's Advantage+ tool also created ads using text that differed from the "10% returns" question initially posed by the reporter. For example, one Meta-generated ad asked, "Tired of living paycheck to paycheck? Break the cycle and start earning a steady weekly income with our proven system."[47]

127.   Meta touts that its tools "enable [advertisers] to automatically promote [their] entire product catalog across Facebook [and] Instagram . . . without having to create thousands of individual ads. Dynamic ads capture the intent signals that customers show on websites and apps to ensure the

---

[46] *Id.*
[47] *Id.*

right products are connected to the right people"[48]—or, in this case, the most misleading ads were connected to the most vulnerable victims.

128.    The JYD scammers used these advertising tools to deploy an array of advertisements that were optimized to target a range of different Facebook and Instagram users.

129.    Meta then targeted the ads to users whose activity suggested an interest in investing. Among other behaviors, members of the JYD Victim Group reported: (i) performing research regarding investing or investment strategies with the same devices they use to access Facebook and Instagram in the weeks and months before they were targeted; (ii) discussing investing or investment opportunities near their devices; and (iii) using their devices to access their investment accounts.

130.    Through its generative content tools and targeting technology, Meta was instrumental in carrying out the JYD Scheme and increasing its scale and effectiveness.

## V.    CLASS ACTION ALLEGATIONS

131.    Plaintiffs bring this Action pursuant to Rule 23 of the Federal Rules of Civil Procedure individually and as a class action.

132.    The proposed class includes all persons who were lured into investing in JYD between March 21, 2025 and April 2, 2025 directly or indirectly as a result of fraudulent advertisements on Facebook and Instagram and suffered losses as a result (the "Class").

133.    The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of thousands of geographically dispersed victims.

134.    There are questions of law and fact common to the Class, which predominate over questions affecting any individual Class member. These common questions include, *inter alia*, whether Defendant is liable for materially contributing to the content of the scam advertisements; whether Defendant breached its contractual obligations to its users; and whether Defendant was unjustly enriched by profiting from fraudulent advertisements that resulted in users losing millions in investments.

---

[48] *See* https://www.facebook.com/business/m/one-sheeters/dynamic-ads (last visited Feb. 4, 2026).

135.    No difficulties are likely to be encountered in the management of this case as a class action.

136.    Defendant has acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

137.    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

138.    Plaintiffs' claims are typical of the claims of other Class members, and Plaintiffs have the same interests as other Class members. Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

139.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

140.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### COUNT I

#### Aiding and Abetting Fraud

141.    Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

142.    The JYD Scheme was a fraudulent scheme designed to manipulate the price of JYD shares, enabling the perpetrators of the fraud to unload their previously undisclosed shareholdings, reaping hundreds of millions of dollars of profits for themselves at the expense of Plaintiffs and the Class.

143.    Fraudulent advertisements on Facebook and Instagram were an essential element used to lure Plaintiffs and the Class into purchasing large amounts of JYD shares at specified price points, allowing the JYD scammers and their co-conspirators to dispose of their shares.

144.    Meta gave substantial assistance to the JYD scammers in carrying out their fraudulent scheme. Through its advertising tools, Meta created and developed hundreds of fraudulent advertisements utilized by the scammers.

145.    Meta also facilitated the targeting of those ads to vulnerable Facebook and Instagram users, including Plaintiffs and the Class. Accordingly, Meta provided the platforms necessary to conduct the fraud, and its advertising tools were central to both developing the scam ads and selecting the users who would be targeted as well as the content that would be shown to specific users.

146.    Meta actually knew the scammers were engaged in fraud or were willfully blind to the scammers' conduct because among other reasons, it knew that the scammers had no actual affiliation with the famous persons and firms touted in the ads, Meta had been repeatedly alerted to investment scams, including from prior lawsuits and reports by financial advisors who were being impersonated on Meta's platforms, and Meta received reports specifically from victims of the JYD Scheme but continued to publish the ads.

147.    Even if Meta did not have actual knowledge of the fraud (it did), Meta substantially participated in the fraud and breached its duty owed to Plaintiffs and the Class.

148.    As a direct and proximate result of the JYD Scheme and Meta's aiding and abetting of that scheme, Plaintiffs and the Class were damaged, and Meta is liable for those damages.

## **COUNT II**

### **Breach of Contract**

149.    Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

150.    Plaintiffs and the Class entered into a services contract with Meta consisting of the ToS, which incorporated by reference the Community Standards and Advertising Policies.

151.    The ToS contain enforceable promises that Meta made to Plaintiff and the Class, including that Meta "does not allow" investment scam ads, has processes in place to review

1   advertisements for compliance with Meta's policies, and will "take appropriate action" when it

2   becomes aware of content that violates its policies.

3       152.   If not for Meta's representations in the ToS, Plaintiffs and other members of the Class

4   would not have consented to being shown advertisements by Meta in exchange for their user of

5   Facebook and Instagram.

6       153.   The ads utilized in connection with the JYD Scheme violated the ToS because they

7   included promises of exorbitant returns and returns that were guaranteed or risk free. The ads also

8   fraudulently impersonated celebrities and legitimate financial advisors.

9       154.   In breach of its obligations under the ToS, Meta not only allowed the ads to be utilized

10   on Facebook and Instagram, it materially contributed to the development of the ads, including by

11   generating, manipulating, and enhancing content that violated the ToS.

12       155.   Meta also failed to take any action to verify that the celebrities and financial advisors

13   featured in the ads had authorized their use and knew its ad customers were not the famous people

14   and firms appearing in the ads. Moreover, contrary to promises that it would "take action" when made

15   aware of potentially fraudulent content, Meta ignored reports by financial advisors that their images

16   and likenesses were being utilized in fraudulent ads on Facebook and Instagram.

17       156.   As a direct and proximate result of Meta's breaches of the ToS, Plaintiffs and the Class

18   suffered damages, and Meta is liable for those damages.

19                               **COUNT III**

20                **Breach of the Implied Covenant of Good Faith and Fair Dealing**

21       157.   Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully

22   set forth herein.

23       158.   In every contract there is an implied promise of good faith and fair dealing.

24       159.   Plaintiffs and other members of the Class entered into a services contract with

25   Facebook consisting of the ToS, which incorporated by reference the Community Standards and the

26   Advertising Policies.

27       160.   The ToS contains enforceable promises that Meta made to Plaintiffs and other

28   members of the Class, including without limitation, the promises set forth above.

161.    Meta engaged in conduct that frustrated and interfered with the rights of Plaintiffs and other members of the Class to the benefits of the ToS, including the right to be targeted only with advertisements that had been subjected to Meta's advertising review system and determined to comply with Meta's stated policies. Without limitation, Meta materially contributed to the development of ads that facially violated its policies, failed to reasonably review the ads to ensure compliance with its policies, and failed to take action when made aware of ads that violated its policies.

162.    Plaintiffs performed all, or substantially all, of their material obligations under the ToS.

163.    As a direct and proximate result of Meta's breach of the covenant of good faith and fair dealing, Plaintiffs and the Class suffered damages, and Meta is liable for those damages.

## COUNT IV

### Promissory Estoppel

164.    Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

165.    Defendant promised Plaintiffs and the Class that it "does not allow investment scam ads," that it had processes in place to review advertisements for compliance with Meta's policies, and that it would "take action" when it becomes aware of content that violates its policies.

166.    These promises were included in Defendant's ToS and Community Standards, which stated that Meta does not allow investment scam advertisements like those in the JYD Scheme.

167.    Plaintiffs and the Class reasonably relied on Defendant's promises when using Meta's products.

168.    Defendant failed to honor its promises by materially contributing to the development of ads that facially violated its policies, failing to reasonably review the ads to ensure compliance with its policies, and failing to take action when made aware of ads that violated its policies.

169.    As a direct and proximate result of Meta's broken promises, Plaintiffs and the Class suffered damages, and Meta is liable for those damages.

## COUNT V

### Negligence

170.    Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

171.    Meta owes legal duties to Plaintiffs and the Class in connection with the services it provides through its Facebook and Instagram platforms.

172.    Meta had ample notice and actual knowledge that scammers were using ads on Facebook and Instagram to carry out investment scams.

173.    Meta was not required to conduct business with scammers and had the capability, without undue burden, to prohibit fraudulent ads utilized on its platforms to carry out the JYD Scheme, or to identify and remove those ads once created, but it chose not to do so in favor of preserving its ad revenue.

174.    Meta actively solicited, encouraged, and assisted the JYD scammers it knew or reasonably should have known were carrying out a fraudulent scheme by materially contributing to the development of the scam ads, including generating, manipulating, and enhancing fraudulent content used in the ads; by failing to implement reasonable policies and procedures to monitor, detect, and remove investment scam ads, including failing to take appropriate action when made aware of the ads used by the JYD scammers; and by facilitating the targeting of investment scam ads to vulnerable users, including Plaintiffs and the Class.

175.    Meta knew or should have known that its breaches of duty set forth above would cause monetary and other damages to Plaintiffs and the Class.

176.    As a direct and proximate result of Meta's breach of its duties, Plaintiffs and the Class foreseeably suffered damages, and Meta is liable for such damages.

## COUNT VII

### Unjust Enrichment

177.    Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

178.    Virtually all of Meta's revenues are derived from sales of advertising services.

179.    Meta profited from its advertising services, which materially contributed to the development of the deceptive advertisements.

180.    Meta knew or should have known that scammers are utilizing its advertising services to carry out investment scams by targeting vulnerable Facebook and Instagram users with deceptive advertisements.

181.    Rather than establishing reasonable policies and procedures to prevent the creation of scam advertisements and to monitor, detect, and remove scam ads that are created, Meta has materially contributed to the creation and proliferation of those ads in order to bolster its valuable advertising revenue stream.

182.    The ads utilized in connection with the JYD Scheme generated revenue for Meta, but resulted in enormous financial losses and other damages to Plaintiffs and the Class. Allowing Meta to retain the revenues from those ads would be unjust and inequitable.

183.    Plaintiffs and the Class are entitled to disgorgement of all profits Meta unjustly realized from ads utilized in connection with the JYD Scheme.

184.    Plaintiffs and the Class otherwise have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Declaring that this suit may proceed as a class action on behalf of the Class, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel pursuant to Fed. R. Civ. P. 23;

B.    Awarding Plaintiffs and the Class monetary relief in the form of damages and/or disgorgement of Defendant's unjust profits in an amount to be proven at trial;

C.    Awarding Plaintiffs and the Class the costs of this action (including without limitation pursuant to Cal. Code of Civ. P. § 1021.5), including reasonable attorneys' fees, accountants' fees, consultants' fees, and experts' fees, costs, and expenses;

D.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

CLASS ACTION COMPLAINT

E.       Awarding declaratory and injunctive relief, including enjoining Defendant from further violation of its contractual and legal duties with respect to fraudulent advertisements on its social media platforms; and

F.       Granting such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: February 5, 2026

*/s/ Leonid Kandinov*

**MORRIS KANDINOV LLP**
Leonid Kandinov (279650)
550 West B Street, 4th Floor
San Diego, CA 92101
Tel. (619) 780-3993
leo@moka.law

**MORRIS KANDINOV LLP**
Aaron T. Morris
Andrew W. Robertson
William H. Spruance
305 Broadway, 7th Floor
New York, NY 10007
Tel. (212) 431-7473
aaron@moka.law
andrew@moka.law
william@moka.law

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT