Leonid Kandinov
MORRIS KANDINOV LLP
550 West B Street, 4th Floor
San Diego, CA 92101
(619) 780-3993
leo@moka.law

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANTHONY IRVING, et al., | Case No. 3:26-cv-01127-WHO |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT** |
| v. | |
| META PLATFORMS, INC., | Judge: Hon. William H. Orrick |
| Defendant. | Courtroom 2, 17th Floor |
| | Date: July 7, 2026 |
| | Time: 2:00 PM |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................. iii

PRELIMINARY STATEMENT ..................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................... 2

    A.  The JYD Pump-and-Dump Scheme.................................................................... 2

    B.  Meta Materially Contributed to Creating the Ads ............................................. 3

    C.  Meta Breached Its Contractual Obligations........................................................ 4

    D.  Meta Was Aware of the Problem of Scam Ads Before the JYD Scheme ......................... 5

ARGUMENT .................................................................................................................................. 6

I.    SECTION 230 DOES NOT SHIELD META FROM LIABILITY ............................................ 6

    A.  Meta Materially Contributed to the Creation of Scam Ads ................................. 7

    B.  Section 230 Does Not Apply to Plaintiffs' Contract Claims ......................................... 10

    C.  Section 230 Does Not Immunize Failures to Warn of Known Risks ............................. 11

II.  SLUSA DOES NOT APPLY TO PLAINTIFFS' CLAIMS........................................................ 11

    A.  Application of SLUSA Here Would be Contrary to the Purpose of the Statute.............. 12

    B.  Meta's Fraudulent Ads Were Not "In Connection With" Any Purchase or Sale of Securities.......................................................................................................... 12

    C.  Meta's Causation Arguments Are Unavailing ................................................. 14

III. DEFENDANT AIDED AND ABETTED FRAUD......................................................... 15

    A.  Meta Had Actual Knowledge of the Fraud ................................................... 15

    B.  Meta Substantially Assisted the Fraud......................................................... 17

    C.  Meta Breached Its Duties to the Class .......................................................... 18

IV. META BREACHED ITS CONTRACTUAL OBLIGATIONS ................................................ 18

V.  PLAINTIFFS ADEQUATELY ALLEGE ALTERNATIVE CLAIMS ..................................... 21

    A.  Good Faith and Fair Dealing....................................................................... 21

    B.  Promissory Estoppel .................................................................................. 22

VI. DEFENDANT WAS NEGLIGENT ...................................................................................22

    A. Meta Engaged in Misfeasance ...............................................................................22

    B. The Economic Loss Doctrine Does Not Bar Plaintiffs' Claim.......................................23

VII.    META IS LIABLE FOR UNJUST ENRICHMENT.......................................................24

CONCLUSION.................................................................................................................25

**TABLE OF AUTHORITIES**

**Cases**                                                                                                                      **Page(s)**

*Abada v. Charles Schwab & Co., Inc.*,
   127 F. Supp. 2d 1101 (S.D. Cal. 2000) ................................................................................. 13

*Ambassador Hotel v. Wei-Chuan Inv.*,
   189 F.3d 1017 (9th Cir. 1999) ............................................................................................... 13

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
   225 Cal. App. 4th 1451 (2014) .............................................................................................. 15

*Anderson v. Edward D. Jones & Co., L.P.*,
   990 F.3d 692 (9th Cir. 2021) ...................................................................................... 12, 13, 14

*AngioScore, Inc. v. TriReme Med., LLC*,
   70 F. Supp. 3d 951 (N.D. Cal. 2014) .................................................................................... 17

*Astiana v. Hain Celestial Grp., Inc.*,
   783 F.3d 753 (9th Cir. 2015) ................................................................................................. 25

*Baldino's Lock & Key Serv., Inc. v. Google LLC*,
   285 F. Supp. 3d 276 (D.D.C. 2018) ........................................................................................ 8

*Barfuss v. Live Nation Ent., Inc.*,
   2025 WL 1843207 (C.D. Cal. May 14, 2025) ....................................................................... 21

*Barnes v. Yahoo!*,
   570 F.3d 1096 (9th Cir. 2009) ........................................................................................... 7, 10

*Barrett v. Apple Inc.*,
   523 F. Supp. 3d 1132 (N.D. Cal. 2021) ................................................................................ 17

*Bhatia v. Silvergate Bank*,
   725 F. Supp. 3d 1079 (S.D. Cal. 2024) ................................................................................. 15

*Bouck v. Meta Platforms, Inc.*,
   2026 WL 810036 (N.D. Cal. Mar. 24, 2026) ................................................................. *passim*

*Bradshaw v. SLM Corp.*,
   652 F. App'x 593 (9th Cir. 2016) .......................................................................................... 16

*Calise v. Meta Platforms, Inc.*,
   103 F.4th 732 (9th Cir. 2024) ...................................................................................... *passim*

*Calise v. Meta Platforms, Inc.*,
   No. 4:21-cv-6186-JSW (N.D. Cal. Sept. 22, 2025) ................................................. 19, 20, 23-24

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) ........................................................................................ 9-10

*Carson v. Mercury Ins. Co.*,
   210 Cal. App. 4th 409 (2012) ...............................................................................................21

*Chadbourne & Parke LLP v. Troice*,
   571 U.S. 377 (2014).......................................................................................... 11, 12, 13-14

*Diaz v. Intuit, Inc.*,
   2018 WL 2215790 (N.D. Cal. May 15, 2018).........................................................................16

*Doe v. Grindr, Inc.*,
   128 F.4th 1148 (9th Cir. 2025) ...................................................................................... 8, 10-11

*Doe v. Internet Brands, Inc.*,
   824 F.3d 846 (9th Cir. 2016) ..........................................................................................7, 11

*Doe v. Meta Platforms, Inc.*,
   690 F. Supp. 3d 1064 (N.D. Cal. 2023) .................................................................................20

*Doe 1 v. Twitter*,
   148 F.4th 635 (9th Cir. 2025) ................................................................................................8

*Doe No. 14 v. Internet Brands, Inc.*,
   2016 WL 11824793 (C.D. Cal. Nov. 14, 2016)......................................................................24

*Dyroff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019) .............................................................................................23

*In re First All. Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) ...........................................................................................15, 16

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ..................................................................................... *passim*

*Fenerjian v. Nongshim Co., Ltd.*,
   2014 WL 5685562 (N.D. Cal. Nov. 4, 2014) .........................................................................24

*Fleming v. Charles Schwab Corp.*,
   878 F.3d 1146 (9th Cir. 2017) ..............................................................................................11

*Forrest v. Meta Platforms, Inc.*,
   737 F. Supp. 3d 808 (N.D. Cal. 2024)........................................................................... *passim*

*Gentry v. eBay, Inc.*,
   99 Cal. App. 4th 816 (2002) ..................................................................................................8

*Gerber v. Twitter, Inc.*,
  2024 WL 5173313 (N.D. Cal. Dec. 18, 2024).................................................................21, 24

*Goddard v. Google, Inc.*,
  2008 WL 5245490 (N.D. Cal. Dec. 17, 2008)........................................................... 9-10

*Goddard v. Google, Inc.*,
  640 F. Supp. 2d 1193 (N.D. Cal. 2009) ........................................................................10

*Gross v. Symantec Corp.*,
  2012 WL 3116158 (N.D. Cal. July 31, 2012).................................................................21

*Isgur v. Meta Platforms, Inc.*,
  2026 WL 194640 (N.D. Cal. Jan. 26, 2026).................................................................20

*J'Aire Corp. v. Gregory*,
  24 Cal. 3d 799 (1979) ....................................................................................................24

*Liapes v. Facebook, Inc.*,
  95 Cal. App. 5th 910 (2023) ................................................................................ *passim*

*Lopez v. Apple, Inc.*,
  519 F. Supp. 3d 672 (N.D. Cal. 2021) ..................................................................... 20-21

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
  925 F.3d 1263 (D.C. Cir. 2019)......................................................................................8

*McKay v. Hageseth*,
  2006 WL 8443033 (N.D. Cal. May 24, 2006)...............................................................18

*In re Meta Pixel Healthcare Litig.*,
  647 F. Supp. 3d 778 (N.D. Cal. 2022) ..........................................................................18

*Murphy v. Twitter, Inc.*,
  60 Cal. App. 5th 12 (2021) ............................................................................................11

*Nevis v. Wells Fargo Bank*,
  2010 WL 11636091 (N.D. Cal. Jan. 13, 2010) .............................................................17

*O'Kroley v. Fastcase, Inc.*,
  831 F.3d 352 (6th Cir. 2016) ...........................................................................................8

*Olson v. Children's Home Society*,
  204 Cal. App. 3d 1362 (Ct. App. 1988)........................................................................24

*Paroline v. United States*,
  572 U.S. 434 (2014).......................................................................................................14

*Pete v. Facebook Data Breach*,
   2026 WL 32635 (N.D. Cal. Jan. 6, 2026) ...................................................................................21

*Prager Univ. v. Google LLC*,
   85 Cal. App. 5th 1022 (2022) ....................................................................................................11

*Precisely Software Inc. v. Loqate Inc.*,
   2022 WL 4348469 (N.D. Cal. Sept. 19, 2022) ...........................................................................24

*In re Robinhood Outage Litig.*,
   495 F. Supp. 3d 831 (N.D. Cal. 2020) ................................................................................. 12-13

*Rowland v. JPMorgan Chase Bank, N.A.*,
   2014 WL 992005 (N.D. Cal. Mar. 12, 2014)..............................................................................22

*S&S Worldwide, Inc. v. Wells Fargo Bank*,
   509 F. Supp. 3d 1154 (N.D. Cal. 2020) ............................................................................... 16-17

*Scala v. Citicorp Inc.*,
   2011 WL 900297 (N.D. Cal. Mar. 15, 2011)........................................................................ 13-14

*Sheen v. Wells Fargo Bank, N.A.*,
   12 Cal. 5th 905 (2022) ........................................................................................................ 23-24

*SLH Indus., LLC v. JPMorgan Chase Bank, N.A.*,
   2025 WL 2629543 (C.D. Cal. July 28, 2025)..............................................................................17

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
   754 F. Supp. 3d 946 (N.D. Cal. 2024) .......................................................................................22

*Squeeze Me Once, LLC v. SunTrust Bank*,
   630 F. Supp. 3d 763 (M.D. La. 2022).........................................................................................17

*Stoyas v. Toshiba Corp.*,
   896 F.3d 933 (9th Cir. 2018) ......................................................................................................13

*Vargas v. Facebook, Inc.*,
   2023 WL 6784359 (9th Cir. Oct. 13, 2023)...................................................................................8

*In re Woodbridge Invs. Litig.*,
   2020 WL 4529739 (C.D. Cal. Aug. 5, 2020)...............................................................................16

*Young v. Facebook, Inc.*,
   2010 WL 4269304 (N.D. Cal. Oct. 25, 2010)..............................................................................20

**Statutes, Rules**                                                                                **Page(s)**

47 U.S.C. § 230......................................................................................................... *passim*

Cal. Civ. Code § 1714.................................................................................................................12, 22

Fed. R. Civ. P. 9.................................................................................................................................15

Fed. R. Civ. P. 12...............................................................................................................................1

**PRELIMINARY STATEMENT**

This action arises from a calculated decision by Defendant Meta Platforms, Inc. ("Meta") to collect billions of dollars of advertising revenues by fostering relationships with criminal scammers seeking to defraud users of Meta's Facebook and Instagram platforms. Despite telling users that scam ads are "not allowed" on its platforms, Meta has turned a blind eye to fraudulent activities in favor of lucrative advertising fees. Meta's advertising tools actively facilitate the schemes by designing and generating thousands of scam ads, enhancing and optimizing each ad to engage particular users of Meta's platforms. Meta then delivers the ads to the targeted users based on their data, creating a supercharged scam marketing machine that has become a "pillar" of the scam economy.

Meta's marketing machine and its messaging application, WhatsApp, were the exclusive means by which Plaintiffs and other members of the proposed Class were lured into a massive pump-and-dump scheme involving shares of a Chinese penny stock company. While Meta lined its coffers with fees charged to scammers, Plaintiffs and the Class were robbed of more than $500 million.

Meta seeks to avoid accountability for its actions by hiding behind § 230 of the Communications Decency Act, 47 U.S.C. § 230. But § 230 is not a "get out of jail free card," and its immunity does not extend to Meta's conduct here, as Judge Seeborg recently held in a case involving substantively identical facts. Plaintiffs do not seek to hold Meta liable for merely publishing scam ads, but rather for (i) its material contribution to the creation and optimization of the ads; (ii) its failure to perform the services it contractually promised to users; and (iii) its failure to warn users of the scammers' activities and the resulting risks.

Meta's argument that Plaintiffs' claims are barred by the Securities Litigation Uniform Standards Act ("SLUSA") is similarly meritless, as Plaintiffs do not allege Meta engaged in securities violations. Plaintiffs' claims arise from Meta's advertising business and its violation of state-law duties and contractual obligations.

Meta's arguments for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) also fail. Meta had actual knowledge that the ads were fraudulent and substantially assisted in their design and distribution, which states a claim for aiding and abetting fraud. Meta, through its assistance to the scammers and its calculated decision to allow scam ads on its platforms, violated its contractual representations that

such content is "not allowed" and that Meta has procedures in place to monitor for and remove it, supporting claims for breach of contract or, alternatively, breach of the covenant of good faith and fair dealing and promissory estoppel. Plaintiffs also state a claim for negligence because Meta's actions in support of the scammers breached its duty of care, and the economic loss doctrine is no bar because, among other reasons, the conduct giving rise to the negligence claim is independent of any contract between the parties. Finally, it would be unjust to allow Meta to retain the advertising fees it collected from scam ads.

Defendant's Motion to Dismiss (Dkt. No. 28; "Mot.") should be denied in its entirety.

## FACTUAL BACKGROUND

### A.    The JYD Pump-and-Dump Scheme

Plaintiffs are victims of a pump-and-dump scam involving securities of Jayud Global Logistics Ltd. ("JYD"). Plaintiffs and other victims comprising the proposed Class were lured into the scam through Facebook and Instagram advertisements, which impersonated celebrities, well-known investors, and legitimate financial advisory firms. ¶¶ 71-74.[1] The ads encouraged users to join fake investment clubs, which promised access to professional stock recommendations, but in reality were a front for scammers to carry out their scheme. ¶ 71. Links in the ads brought users into WhatsApp groups where scammers posing as financial professionals engaged with victims to build rapport, provided market commentary, and made investment recommendations. ¶¶ 79-84.

In March 2025—weeks or months after victims were first lured into the scheme by Meta's ads—scammers within the WhatsApp groups began to recommend investment in JYD, a company operating in China and listed on the NASDAQ stock exchange. ¶ 12. Unbeknownst to the victims, the recommendations were designed to create a market for the scammers' co-conspirators, who had acquired nearly 50 million JYD shares in non-bona fide offerings. ¶ 14. The co-conspirators unloaded their shares by entering sale transactions at price points matching those fed to victims by the scammers posing as financial advisors in the WhatsApp groups. ¶ 88.

---

[1] Citations in the form "¶ __" are to Plaintiffs' Class Action Complaint (Dkt. No. 1; the "Complaint"). Unless otherwise indicated, all emphasis herein is added.

JYD's stock price more than doubled from late March to April 1, 2025 (when it peaked at $7.90 per share). ¶ 90. In total, the co-conspirators dumped nearly 46 million JYD shares on April 1 and April 2, causing the stock price to fall precipitously, losing 95% of its value by the following day. ¶ 92. Losses for the Class are estimated to be more than $500 million. ¶ 93.

## B.    Meta Materially Contributed to Creating the Ads

Meta derives substantially all its revenues from advertising services, with businesses—both legitimate and illegitimate—paying Meta more than $160 billion (97% of total revenues) in 2024 to market their products and services to Facebook and Instagram users. ¶ 31. Meta offers advertisers the ability to target their ads to users based on data Meta collects about the users' activity on Facebook and Instagram, as well as their activity outside of Meta's platforms. ¶¶ 33-35. In addition to its targeting capabilities, Meta's advertising services include the creation and development of ads for its customers, essentially filling the role of a traditional advertising agency. ¶ 36.

Meta provides ad development services through a suite of tools, enhanced by artificial intelligence ("AI"), that generate and optimize advertisements. ¶ 37. These tools include: (a) "Ads Manager," which Meta touts as "an all-in-one tool" for creating, managing, and tracking ads, ¶ 38; (b) "Flexible Format," which "automatically optimizes" ads, with Meta's tool, rather than the advertiser, selecting the specific images and content that Meta predicts will produce the most user engagement, ¶ 121; (c) "Dynamic Creative," which "mixes and matches" ad content "in new ways" to "automatically create personalized creative variations for each person who views [the] ad," ¶ 122; and (d) "Advantage+ Creative," which uses generative AI to apply "creative enhancements," including AI-generated images and text, to optimize advertisements, ¶ 123. Meta promotes these tools as eliminating the need for advertisers to create "thousands of individual ads" because the tools automatically generate, adapt, and modify the content. ¶ 127.

A December 2025 Reuters report documents the power of the Advantage+ tool to generate original ads. ¶ 124. Mimicking the JYD scammers, the reporter prompted the tool to create an ad asking Facebook and Instagram users if they were "interested in making 10% weekly returns." The Advantage+ tool created numerous versions of the ad featuring AI-generated visuals, not provided by the reporter. ¶ 125. The tool also created ads using new text that differed from the reporter's "10%

returns" prompt, with one Meta-generated ad asking, "Tired of living paycheck to paycheck? Break the cycle and start earning a steady weekly income with our proven system." ¶ 126.

Meta's advertising tools enabled the JYD Scheme by creating thousands of advertisements on behalf of the scammers, which were "optimized" to drive engagement. ¶ 128. Meta targeted the advertisements to individual Facebook and Instagram users based on data Meta collected about them, including their interests and content they previously interacted with. ¶ 129.

### C.    Meta Breached Its Contractual Obligations

Meta entered into a contract with users of its social media platforms, including Plaintiffs, which consists of Meta's Terms of Service ("ToS") and certain incorporated policies, including "Community Standards" and "Advertising Policies." ¶¶ 98-105. Meta represents that it "employ[s] dedicated teams around the world" and uses "advanced technical systems to detect potential misuse of our Products," "including . . . to *respond to user reports of potentially violating content*," and that it "may *take appropriate action*" if it becomes aware of violating content, including "removing content" or "disabling an account." ¶ 101. Meta further states that "*[i]f content goes against our policies, we take action on it*." ¶ 103.

Meta's Community Standard on "Fraud, Scams, and Deceptive Practices" strictly prohibits content relating to financial scams, which Meta defines as "Content that attempts to scam or defraud users and/or businesses by means of . . . [offering] investment opportunities where returns on investment are guaranteed or risk-free [or] investment opportunities where the opportunity is of a 'get-rich-quick' nature and/or claims that a small investment can be turned into a large amount." ¶ 105. Meta states that it "remov[es] content and combat[s] behavior" that violates this policy. ¶ 107.

Meta's Advertising Policies incorporate the Community Standard on Fraud, Scams, and Deceptive Practices, stating that "Ads Must Comply" with that standard. ¶ 108. Meta represents that it has established an "ad review system [to] review[] ads for violations of our policies," and that such system "starts automatically before ads begin running" and includes review of "the specific components of an ad, such as images, video, text and targeting information." ¶ 109.

The ads utilized in connection with the JYD Scheme facially violated Meta's Community Standards and Advertising Policies. *See* ¶¶ 77-81. Contrary to its representations, Meta systematically

permitted financial scam ads to preserve its advertising revenues. ¶¶ 42-48. Further, Meta refused to remove ads used in the JYD Scheme *even when* members of the Class and financial advisors impersonated in those ads reported them. ¶¶ 117-118.

Meta has made a deliberate business decision to participate in fraudulent activity in exchange for lucrative revenues from scam ads. ¶¶ 42-48. Indeed, Meta has actively fostered relationships with known scammers in China and has established policies to allow scam ads to proliferate. ¶¶ 52-55. Meta bans advertisers only if its automated ad review tools determine with *at least 95% certainty* that they are committing fraud. ¶ 47. A small advertiser will not be removed until it has been flagged for promoting financial fraud at least eight times, while so-called "High Value Accounts"—*i.e.*, those that generate more ad revenue for Meta—can accumulate *more than 500 strikes* without Meta shutting them down. *Id.* Even if Meta believes the advertiser is likely a scammer, it allows the advertiser to remain active, but charges higher ad rates—essentially allowing scammers to pay more for the privilege of targeting Facebook and Instagram users with scam ads. ¶ 48. Meta also has abandoned initiatives to reduce scam ads from China and has refused to implement identity verification requirements despite direct experience showing they are successful in reducing scam ads. ¶¶ 54, 115 n.41. As a result, Meta's own documents show that "the company shows its platforms' users an estimated *15 billion 'higher risk' scam advertisements* . . . every day." ¶ 46.

**D.**    **<u>Meta Was Aware of the Problem of Scam Ads Before the JYD Scheme</u>**

Meta created and distributed the fraudulent ads even though it knew that its ad clients were not affiliated with the people and firms touted in the ads and despite years-long awareness that scammers were using its platforms to impersonate investment firms. ¶¶ 56-70. In addition to extensive reporting and warnings, Meta was sued by British personal finance expert Martin Lewis, who was impersonated by scammers peddling get-rich-quick schemes on Facebook; the Australian Competition and Consumer Commission, which alleged Meta aided and abetted crypto investment scams through ads impersonating prominent Australians; and scam victims in Japan on facts similar to this case. ¶¶ 60-61, 68. Further, in February and June 2024, Meta was advised of scams nearly identical to the JYD scheme, first by nine investor victims who sent a certified letter to Meta detailing the scam, and then by an advisory firm whose CEO was being impersonated on WhatsApp. ¶¶ 56, 66.

Then, in January 2025, victims of a pump-and-dump scheme involving China Liberal Education Holdings, Ltd. ("CLEU") contacted Meta regarding scam ads on Facebook and Instagram. ¶ 69. Victims of the CLEU scam reported dozens of ads that, just like those used in the JYD Scheme, impersonated celebrities, well-known investors, and legitimate financial advisory firms, and invited users to join purported investment clubs, operated through WhatsApp, with promises of tremendous investment returns. *Id*. Yet, Meta refused to take the ads down and continued to allow new scam ads to run. *Id*.

## ARGUMENT

### I.    SECTION 230 DOES NOT SHIELD META FROM LIABILITY

Meta seeks an unprecedented and unwarranted expansion of § 230 that strays far beyond Congress's purpose in enacting the statute. Enacted at the very infancy of the internet thirty years ago, § 230 was intended to enable internet service providers to remove unlawful content without fear of liability. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (statute "provides 'Good Samaritan' protections . . . for actions to *restrict* . . . access to objectionable online material") (quoting H.R. Rep. No. 104-458 (1996)) (emphasis in original). Here, Meta employs § 230 not to protect its ability to remove unlawful content, but as cover for ***knowingly facilitating*** fraudulent content on its social media platforms because of the revenues it derives from scam ads. *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 747 (9th Cir. 2024) (Nelson, J., concurring) (cautioning against interpretations of § 230 that would encourage "willful blindness" particularly where defendant "has an economic incentive to permit unlawful content").

Meta's core business is advertising, but unlike traditional advertising agencies, it operates without reasonable safeguards to protect against fraudulent advertisements. Heedless of the risks to users of its platforms, Meta (a) actively courts business from known and suspected scammers and charges premium rates to those customers to bolster its ad revenues, ¶¶ 42-48, 50-55; (b) allows ads to run even when Meta knows with up to 95% certainty that a particular ad is fraudulent, ¶ 47; (c) permits its most lucrative customers to run as many as 500 fraudulent ads before removing them from the platform, *id*.; (d) runs advertisements featuring celebrities, public figures, and regulated financial professionals despite knowing that those individuals did not purchase the ads and without

verifying that use of the person's image or likeness was authorized, ¶¶ 75, 116-118; and (e) provides AI-enabled tools that generate scam ads by the dozens and develop new, "optimized" content to enhance the ability of the ads to defraud Meta's users, ¶¶ 119-130. A brick-and-mortar ad agency undoubtedly would face liability if it engaged in these business practices, and § 230 does not immunize such conduct merely because it occurs online. *See Roommates*, 521 F.3d at 1164 ("[Section 230] was not meant to create a lawless no-man's-land on the Internet."); *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016) (statute is not "an all purpose get-out-of-jail-free card").

### A.    Meta Materially Contributed to the Creation of Scam Ads

Plaintiffs do not seek to hold Meta liable as a mere "publisher" of "content provided by another," as required for § 230 immunity to apply. *See* Mot. at 6 (citing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009)). Instead, Plaintiffs allege that Meta was instrumental in developing the scam ads and determining the ultimate appearance of each post. *See* ¶¶ 119-130. Accordingly, Meta itself was an "information content provider," and its conduct falls outside the scope of § 230's immunity provision. *See* 47 U.S.C. § 230(f)(3); *see also Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 929 (2023) (§ 230 inapplicable where Facebook "materially contributed" to ads).

Meta's advertising tools created unique variations of ads by "mixing and matching" content elements (images, video, text, etc.) and applying AI-generated "creative enhancements" to optimize the ads' performance. ¶¶ 121-129. Meta's tools create entirely *new* content, including original text, language, and imagery beyond that provided by the advertiser. *See* ¶¶ 123-128. Through its ad tools, Meta—not the scammers—created thousands of ads that lured victims into the JYD Scheme. ¶¶ 128-130. Far from "conclusory," Plaintiffs' allegations are based on Meta's own description of its tools and investigative reporting documenting the actual functionality of those tools. ¶¶ 119-130.

Courts in this District have twice held that § 230 does not apply based on virtually identical allegations that Meta's ad tools materially contributed to the creation of scam ads. In *Bouck v. Meta Platforms, Inc.*, Judge Seeborg denied Meta's motion to dismiss a nearly identical complaint because it "averred that Meta participated in the construction of the ads by literally *generating*, using artificial intelligence, the images and text in the advertisements. That degree of participation is not protected by section 230." 2026 WL 810036, at *4 (N.D. Cal. Mar. 24, 2026). In *Forrest v. Meta Platforms,*

*Inc.*, Judge Pitts similarly found § 230 inapplicable where the plaintiff alleged, like here, that "Meta's Ads Manager software drives and ultimately determines what the completed, paid-for ads will look like," including by "mixing and matching ad components like images, videos, text, and audio and by using generative artificial intelligence." 737 F. Supp. 3d 808, 818 (N.D. Cal. 2024) (cleaned up).

Defendant's argument that Meta's ad tools are "content-neutral" "generally available" tools fails. *See* Mot. at 8. A tool does "not become 'neutral' within the meaning of [§ 230] doctrine simply because the tool is also offered to others." *Vargas v. Facebook, Inc.*, 2023 WL 6784359, at *3 (9th Cir. Oct. 13, 2023). To be neutral, the "system must do ***absolutely nothing*** to enhance the unlawful message at issue beyond the words offered by the user." *Liapes*, 95 Cal. App. 5th at 930 (quotations omitted). A party contributes to the illegality of content if it is "more than a passive transmitter of information provided by others" and "becomes the developer, at least in part, of that information." *Roommates*, 521 F.3d at 1166. Here, Meta's ad tools contributed to the unlawful message of the ads by contributing new content to lure users into a fraudulent investment scheme. *See* ¶¶ 119-130. Like *Forrest*, these allegations present "a factual dispute regarding whether Meta's ad systems were neutral tools" and whether Meta's contributions were "entirely unrelated to the aspects of the ads that allegedly make them illegal." *See* 737 F. Supp. 3d at 818 (Meta's tools "supercharge Meta's ability to produce and drive the Scam Ads to vulnerable viewers"); *see also Bouck*, 2026 WL 810036, at *4 (acknowledging Plaintiffs' evidence here is even more robust than in *Forrest*).[2]

---

[2] Defendant's case law is readily distinguishable because the content at issue was created solely by third parties, and there were no allegations that the platforms contributed to its development. *See Calise*, 103 F.4th 732 (scam ads created entirely by third parties, with no allegations relating to Meta's advertising tools); *Doe 1 v. Twitter*, 148 F.4th 635 (9th Cir. 2025) (failure to remove pornographic images created by third parties); *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1268 (D.C. Cir. 2019) (inclusion of information provided by third-parties in search results and mapping tool); *Baldino's Lock & Key Serv., Inc. v. Google LLC*, 285 F. Supp. 3d 276, 283 (D.D.C. 2018) (same); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 832 (2002) (claim to hold eBay liable as warrantor for forged sports memorabilia, but sellers provided all representations regarding auctioned goods); *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352, 355 (6th Cir. 2016) (claim based on information about legal proceedings in search results; Google alleged only to have "performed some automated editorial acts . . . , such as removing spaces and altering font"). *Doe v. Grindr, Inc.* is further afield, as it involved allegations that Grindr's algorithm facilitated communications between adults and underage users, with no allegations Grindr contributed to any content. 128 F.4th 1148 (9th Cir. 2025).

Meta contends that it cannot be liable because the scammers determined the "core message" of the ads (Mot. at 9), but Judge Seeborg rejected the same argument based on allegations that Meta's tools "enhance" the advertiser's message and generate new content. *See Bouck*, 2026 WL 810036, at *5 ("it is at least plausible that some of the illegal content (*i.e.*, the fraudulent statements in the ads) was created by Meta, not by the scammers…that language is still the creation of Meta").

Nor can Meta avoid liability by contending that the advertiser has "discretion" or "clicks a button to publish" the content Meta creates. Mot. at 10. Meta's own descriptions of its products belie this argument, stating that the tools "automatically" generate ads. For example, "Flexible Format" "automatically optimizes" the ad and "show[s] what [Meta] predicts is the best format," meaning advertisers "***don't need to select different ad formats for different ad placements***, ***as it'll be selected for [them]***." ¶ 121. Similarly, the Dynamic Creative tool "mixes and matches" multiple media to "***automatically create personalized creative variations for each person who views [the] ad***." ¶ 122.

The potential involvement of others "does not preclude [Meta] from *also* being an information content provider by helping 'develop' at least 'in part' the information at issue." *Liapes*, 95 Cal. App. 5th at 930 (internal quotations omitted; emphasis in original). The relevant test is whether Meta is responsible "in whole or ***in part***" for creation of the offending content. *See* 47 U.S.C. § 230(f)(3). In *Roommates*, the Ninth Circuit rejected a virtually identical argument that the defendant was not liable because it was the user who "pushe[d] the last button or [took] the last act before publication," analogizing that "[t]he projectionist in the theater may push the last button before a film is displayed on the screen, but surely this doesn't make him the sole producer of the movie." 521 F.3d at 1166-67.

Again, Defendant's case law is distinguishable. In *Carafano v. Metrosplash.com, Inc.*, the defendant website operator "did not play a significant role in creating, developing, or 'transforming' the relevant information," and the Ninth Circuit acknowledged that § 230 would *not* have applied had the operator been so involved. *See* 339 F.3d 1119, 1125 (9th Cir. 2003) ("[T]he statute would . . . bar Carafano's claims *unless Matchmaker created or developed the particular information at issue*."); *see also Bouck*, 2026 WL 810036, at *5 (distinguishing *Carafano*). Similarly, in *Goddard v. Google, Inc.*, Google was not alleged to have created or developed (or even altered) the advertisements themselves; rather, it proposed "keywords" that caused ads to appear alongside a user's search results

when using Google's flagship search engine. *See* 2008 WL 5245490, at \*1 (N.D. Cal. Dec. 17, 2008) (describing function of "keywords"). As in *Carafano*, the *Goddard* court acknowledged that § 230 would not have applied if the plaintiff had plausibly alleged that Google "collaborate[d] in the development of illegal content." *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009). Here, in contrast, Plaintiffs allege extensive facts demonstrating that "Meta worked with the scammers to gin up the offending posts," which is "enough to disrobe Meta of section 230 immunity." *Bouck*, 2026 WL 810036, at \*5 (internal citations omitted).

**B.      Section 230 Does Not Apply to Plaintiffs' Contract Claims**

Section 230 does not apply to Plaintiffs' contract-based claims because those claims arise from Meta's contractual representations, and not from its role as a publisher of third-party content. *See Barnes*, 570 F.3d at 1107 (no immunity where "[c]ontract liability . . . would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication").

As discussed in more detail below (*see* § IV, *infra*), Meta represents that it "do[es] not allow" scam ads, has dedicated systems in place to identify, and "takes action" against violating content. ¶¶ 98-111. Contrary to those representations, however, Meta allows and actively facilitates scam ads on its platforms. ¶¶ 112-118. The Ninth Circuit recently considered nearly identical allegations that "although Meta outwardly claims that it tries to combat scam ads, it instead affirmatively invites them by 'actively soliciting, encouraging, and assisting scammers it knows, or should know, are using its platform to defraud Facebook users with deceptive ads'" in order to generate "'billions of dollars per year in revenue from' scam ads." *Calise*, 103 F.4th at 736-37. The court held that "Meta's duty arising from its promise to moderate third-party advertisements is unrelated to Meta's publisher status, and § 230(c)(1) does not apply." *Id.* at 745. While Meta has made immaterial modifications to its ToS after *Calise*, as discussed below, it continues to represent that Meta "do[es] not allow" scam ads and that it employs ad review and content removal procedures to combat scam ads, while actively courting business from scammers and deliberately allowing scam ads to proliferate. *See* § IV, *infra*.

Defendant's reliance on *Doe v. Grindr* is misplaced because that case involved a general statement that the platform would maintain a "safe and secure environment for its users," but the

defendant did not represent that it had specific rules or procedures that it knowingly did not abide by. *See* 128 F.4th at 1154.[3] Here, Plaintiffs do not rely on a "general monitoring policy," but on specific representations about the types of content Meta prohibits and its promised efforts to combat such content, which it knowingly and systematically failed to implement.

Readers of the ToS would reasonably expect that Meta would maintain personnel and systems designed to monitor for prohibited content and that it would take appropriate action when it became aware of such content, thereby providing a measure of comfort that they could safely participate on Meta's platforms. Meta's deliberate failure to do so is a violation of its contractual commitments that is not subject to § 230's protections.

### C. Section 230 Does Not Immunize Failures to Warn of Known Risks

Section 230 also does not provide immunity with respect to Plaintiffs' negligence claim because liability is predicated, in part, on Defendant's failure to warn users of the proliferation of scam ads despite notice from an array of sources, including reports from scam victims and financial advisors impersonated in fraudulent ads. *See* ¶¶ 56-70. Thus, liability arises from its knowledge of the risks to its users and its failure to warn users of those risks, not mere publication. *See Doe v. Internet Brands*, 824 F.3d at 851 (no § 230 immunity "for failing to warn [users]. . . about how third parties targeted and lured victims" through its site because warnings "would not require Internet Brands to remove any user content or otherwise affect how it publishes or monitors such content").

### II. SLUSA DOES NOT APPLY TO PLAINTIFFS' CLAIMS

A "claim is not automatically SLUSA-barred merely because it involves securities." *Fleming v. Charles Schwab Corp.*, 878 F.3d 1146, 1153 (9th Cir. 2017). Congress "purposefully maintained state legal authority" over state-law remedies through "numerous provisions" in SLUSA, even if fraud involves securities in some way. *See Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 391 (2014).

---

[3] Meta's other citations are inapposite because they involve courts enforcing the defendants' terms of service, but finding no breach had been alleged. *See, e.g.*, *Prager Univ. v. Google LLC*, 85 Cal. App. 5th 1022, 1037 (2022) (dismissing claims because "express terms of the integrated agreements" refuted plaintiff's theory of breach); *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 35 (2021) (dismissing plaintiff's claim based on suspension of her account because terms of service reserved platform's right to suspend accounts "for any or no reason").

Meta's attempt to use SLUSA to shield itself from accountability to Plaintiffs should be rejected because (a) application of SLUSA here would undermine the purpose of the statute; and (b) the content created by Meta was not "in connection with" the purchase or sale of any securities.

### A.    Application of SLUSA Here Would be Contrary to the Purpose of the Statute

This action focuses on Meta's role as a quasi-advertising agency and its relationships with its advertising customers. ¶¶ 31-39, 50-55. Plaintiffs allege that Meta breached its common law and statutory duty of care by fostering relationships with advertisers that it knew or should have known were engaged in fraud and by developing ads used to lure its platforms' users into fraudulent schemes. ¶¶ 170-176. These are matters of state law, as Meta's Terms of Service acknowledge. *See* Ex. A to Compl. (Dkt. No. 1) ¶ 4.4 ("[T]he laws of the State of California will govern these Terms and any claim, cause or action, or dispute."); Cal. Civ. Code § 1714; *see also Forrest*, 737 F. Supp. 3d at 820 (noting California's broad duty of care). Meta's argument that SLUSA precludes enforcement of its state-law duties merely because this scam was carried out using securities "would interfere with state efforts to provide remedies for victims of ordinary state-law frauds." *See Anderson v. Edward D. Jones & Co., L.P.*, 990 F.3d 692, 700 (9th Cir. 2021) (quoting *Troice*, 571 U.S. at 391).

### B.    Meta's Fraudulent Ads Were Not "In Connection With" Any Purchase or Sale of Securities

Under SLUSA's "in connection with" prong, the alleged misrepresentation must be "material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered security.'" *Troice*, 571 U.S. at 387. A "material" connection must be "a connection that matters," and a connection matters only "where the misrepresentation makes a significant difference to [the] decision to purchase or sell a covered security." *Id.* at 387-88.

*Troice* marked a "shift" in the Supreme Court's approach to SLUSA's "in connection with" requirement. *See Anderson*, 990 F.3d at 703. Post-*Troice* courts must "inquir[e] into the materiality of the alleged misrepresentation or omission to the purchase or sale of a covered security" to determine if there is a "connection that matters" between the two. *See id.* at 702-03.

Materiality is established where the alleged misstatement "relate[s] to the nature of the securities, the risks associated with their purchase or sale, or some other factor with similar connection

to the securities themselves." *In re Robinhood Outage Litig.*, 495 F. Supp. 3d 831, 834 (N.D. Cal. 2020) (internal quotations omitted); *see also Ambassador Hotel v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999) ("in connection with" requirement satisfied where alleged "[d]eception relate[s] to the value or merit of the securities in question"). Here, however, the fraudulent content consisted of the impersonation of celebrities, investors, and advisory firms while promoting fake investment clubs, and Plaintiffs do not allege that Meta's ads contained false or misleading information about JYD specifically. *See* ¶¶ 71-74; *see also Abada v. Charles Schwab & Co., Inc.*, 127 F. Supp. 2d 1101, 1103 (S.D. Cal. 2000) ("in connection with" requirement not met when "defendant's conduct [has] nothing to do with the trading of any *particular* security").

Nor do Plaintiffs contend that Meta's fraudulent ads were "done to induce the purchase" of JYD securities, as required to establish materiality. *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 951 (9th Cir. 2018). Instead, Meta's involvement was at an earlier stage in the scheme and was done to induce Plaintiffs into the antecedent act of engaging with the scammers in the WhatsApp groups. The scammers then groomed Plaintiffs for months and ultimately induced them to purchase JYD shares.

Courts have recognized that SLUSA does not apply in similar circumstances where misrepresentations are alleged only to have induced the plaintiffs to establish relationships with brokers, rather than causing them to purchase any particular security. *See, e.g.*, *Anderson*, 990 F.3d at 706 (SLUSA did not preempt claims when plaintiffs alleged that fraud caused them to change "their investment behavior" and find a "new broker"); *Abada*, 127 F. Supp. 2d at 1103 (SLUSA preemption did not apply because the "defendant's conduct had nothing to do with the trading of any particular security" or "concern the risk of a particular investment"); *Robinhood*, 495 F. Supp. 3d at 835 (SLUSA did not apply when broker's misrepresentations induced plaintiff to use its services but did not reference any specific securities). Likewise, here, because Meta's inducement of Plaintiffs into interacting with the scammers did not intrinsically involve the purchase of JYD securities, Meta's ads were not "in connection with" any purchases that ultimately were made for purposes of SLUSA.

Defendant's sole citation in support of its "in connection with" analysis pre-dates the Ninth Circuit's shift in analysis following *Troice* and is factually distinct. In *Scala v. Citicorp Inc.*, Ponzi scheme victims sued the Citigroup family of financial institutions for their role in aiding and abetting

a fraud perpetrated by Joseph Viola. *See* 2011 WL 900297, at *2 (N.D. Cal. Mar. 15, 2011). *Scala* was decided before *Troice* and relied heavily on the Supreme Court's earlier decision in *Dabit*, which it regarded as requiring "very broad reading" of the "in connection with" requirement that would be satisfied "even if the alleged fraud merely 'coincide[s]' with a securities transaction." *Scala*, 2011 WL 900297, at *5-7 (alteration in original). Insofar as *Scala* relied on that "very broad reading" to hold that SLUSA applied to allegations that the Citi defendants helped lure clients into Viola's scheme, that is no longer the law post-*Troice*. *See Anderson*, 990 F.3d at 706 n.8 ("some pre- *Troice* cases held that a broker-investor relationship satisfied the 'in connection with' requirement," but those are "in contrast to the post-*Troice* cases").

Moreover, *Scala*'s allegations are materially different from those here because the defendants were financial institutions engaged in conduct directly related to securities transactions and matters traditionally governed by federal securities laws. Despite its knowledge of Viola's fraud, Citi allowed Viola to open accounts to hold client funds; deliberately failed to monitor the accounts in violation of federal regulations; met with Viola's clients; recommended that they transfer their portfolios to Viola's accounts; and approved transfers of millions of dollars. *Id* at *2-3. Here, in contrast, the claims against Meta arise from its advertising services, which are governed by state law, and Meta did not engage in *any* securities-related conduct.

### C.    Meta's Causation Arguments Are Unavailing

Meta suggests that a holding that its actions were not "in connection with" the purchase of JYD securities for purposes of SLUSA would "concede the absence of a causal connection between Meta's conduct and their alleged injuries." *See* Mot. at 5. That argument conflates distinct concepts that serve different purposes and require different showings.

The "in connection with" prong establishes the scope of SLUSA's preclusive effect; the claims in question must be sufficiently connected to a securities transaction for liability to be governed only by federal securities laws. In contrast, the doctrine of proximate cause defines the extent of a tortfeasor's liability such that it is liable only for the "foreseeable" consequences of its negligence and does not face liability for harm that "is more aptly described as mere fortuity." *See Paroline v. United States*, 572 U.S. 434, 445 (2014). Here, although Meta did not make any representations about

JYD securities or induce any Plaintiff to purchase those shares as required to satisfy SLUSA, the purchase of JYD was a foreseeable consequence of developing scam advertisements designed to promote fraudulent investment groups, as required to establish proximate cause.

Similarly, the "substantial factor" requirement establishes the scope of aiding and abetting liability by requiring a showing that the defendant's "assistance . . . was a substantial factor in causing the harm suffered." *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1476 (2014) (quotations omitted). Again, that requirement is satisfied here, even though Meta is not alleged to have made any misrepresentations regarding JYD or to have induced any Plaintiff to purchase JYD shares. Meta's ads were the critical first step in the scheme, which induced Plaintiffs to engage with the scammers, who, in turn, induced Plaintiffs to purchase JYD shares. Meta's attempt to conflate the causation elements of Plaintiffs' tort claims with SLUSA's "in connection with" standard is unsupported by any case law, statutory text, or legal principles.

### III.    DEFENDANT AIDED AND ABETTED FRAUD

"[L]iability may be imposed on one who aids and abets the commission of an intentional tort if the person knows the other's conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the other to so act." *In re First All. Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006) (internal quotation marks and alterations removed). Under Fed. R. Civ. P. 9(b), "knowledge may be averred generally." *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1118-19 (S.D. Cal. 2024).

#### A.    Meta Had Actual Knowledge of the Fraud

The Complaint includes extensive allegations that Meta knew, based on information available to it at the time, that the JYD scammers were engaged in a fraudulent scheme. Meta not only knew that its platforms were rife with scam ads; it had specific knowledge of scams perpetrated through ads impersonating celebrities and legitimate financial advisors.

Meta had been repeatedly alerted to such scams by victims and by persons who were impersonated in the ads; it was facing litigation in Australia and Japan; and the scams were being reported by major news outlets. *See* ¶¶ 56-70. Moreover, Meta had been alerted to at least two schemes that were materially *identical* to the JYD scam, with the victims providing Meta precise details of how the scam was implemented and reported dozens of examples of the ads used. ¶¶ 56, 69. The

victims specifically warned that scammers would "deploy the same plot" and do it "soon," and they implored Meta "to take immediate and decisive action to address this urgent issue." ¶ 57.

The Complaint further alleges that Meta knew from its dealings with the JYD scammers that they were engaged in fraud. Meta knew of the content of the ads because it helped create them and because it claims to review every ad before publication. ¶ 109. That content—including promises of guaranteed, immediate and exponential returns—is precisely of the type Meta's own policies identify as the hallmark of financial fraud. *See* ¶ 105. Moreover, Meta's policies reflect its awareness of impersonation-based scams, and Meta necessarily knew from its customer records that none of the celebrities, renowned investors, and legitimate financial advisory firms featured in the ads were actually associated with accounts disseminating ads for investment schemes. *See* ¶ 106.

Meta's knowledge of the nature and content of the ads—particularly given repeated warnings about virtually identical scams—establishes actual knowledge. *See In re First All. Mortg. Co.*, 471 F.3d at 999 ("[R]ed flags which were seemingly ignored…establish actual knowledge under the California aiding and abetting standard."); *see also Woodbridge Invs. Litig.*, 2020 WL 4529739, at *6 (C.D. Cal. Aug. 5, 2020) (actual knowledge based on the defendant's "close business relationship with [fraudster]" and other red flags).

Meta's case citations are not analogous because they did not involve allegations plausibly suggesting that the defendants knew about underlying fraud. In *Diaz v. Intuit, Inc.*, the alleged tax fraudster made a new, believable email address and registered new accounts with TurboTax, which were used to file fraudulent tax returns. 2018 WL 2215790, at *7 (N.D. Cal. May 15, 2018). Intuit did not surmise that the new accounts were, in fact, fraudulent, and the court was not convinced that Intuit could have "distinguish[ed] with certainty legitimate tax returns from fraudulent tax returns at the time of filing based upon the account activity associated with Diaz's name." *Id.* Similarly, in *Bradshaw v. SLM Corp.*, there were no facts other than "general allegations" of fraud, which the court found to be "too generic." 652 F. App'x 593, 594 (9th Cir. 2016).[4]

---

[4] *See also, e.g.*, *S&S Worldwide, Inc. v. Wells Fargo Bank*, 509 F. Supp. 3d 1154, 1166 (N.D. Cal. 2020) (finding "no facts to support a finding that, prior to or at the time of the Initial Wire, [Wells

As Judge Seeborg recognized in *Bouck*, this case presents an entirely different scenario because Meta had ample, contemporaneous information indicating that the ads at issue were in furtherance of fraud, but it nonetheless made a business decision to permit the JYD ads, as well as millions of other scam ads. *Bouck*, 2026 WL 810036, at *6.[5]

### B.    Meta Substantially Assisted the Fraud

 "[E]ven routine operations may constitute substantial participation if done with knowledge" of the fraud. *AngioScore, Inc. v. TriReme Med.*, *LLC*, 70 F. Supp. 3d 951, 960 (N.D. Cal. 2014). Here, Meta's active role in luring victims into the JYD Scheme easily demonstrates substantial assistance. *See Bouck*, 2026 WL 810036, at *7 (ruling that plaintiffs adequately alleged that "Meta contributed to the fraud by participating in the creation and dissemination of the ads"); *see also Liapes*, 95 Cal. App. 5th at 927 (finding substantial assistance to illegal discrimination where Facebook followed advertisers' discriminatory targeting decisions).

Rather than disputing its role, Meta merely recycles arguments about whether it "actually knew" of the fraud, which it did for the reasons set forth above. *Barrett v. Apple Inc.* is not analogous because the defendant was not alleged to have given "any specific authorization to the Apple Developers or Apple IDs associated with unlawful activity," and plaintiffs did not allege that authorization was given "with the knowledge and specific intent of aiding and abetting and facilitating" this unlawful activity. 523 F. Supp. 3d 1132, 1148 (N.D. Cal. 2021). In contrast, Meta enabled the fraud by developing and promulgating false advertisements that it knew wrongfully impersonated people and firms not associated with the ads.

---

Fargo] had actual knowledge of [the fraudster's] scheme to trick [the company] into wiring funds to [his] account."); *Nevis v. Wells Fargo Bank*, 2010 WL 11636091, at *1-2 (N.D. Cal. Jan. 13, 2010) (no facts alleged that banking supervisor was even "aware of [plaintiff's] loan application, ever spoke with [plaintiff] over the phone or in person or even knew that [plaintiff] existed").

[5] Meta ignores substantive allegations regarding its knowledge of and business decisions to facilitate fraudulent ads, including disbanding its anti-scam unit, allowing hundreds of violations, and charging premiums to known scammers. *See, e.g.*, ¶¶ 43-55. These allegations distinguish this case from Meta's authorities. *See SLH Indus., LLC v. JPMorgan Chase Bank, N.A.*, 2025 WL 2629543, at *3 (C.D. Cal. July 28, 2025) (no allegations "defendant knew at the time" that the activity was fraudulent); *Squeeze Me Once, LLC v. SunTrust Bank*, 630 F. Supp. 3d 763, 775 (M.D. La. 2022) ("undisputed" that defendant had no manual intervention, review process, or company response related to the fraudulent activity).

## C.    Meta Breached Its Duties to the Class

Plaintiffs may state a claim for aiding and abetting in the alternative by alleging that Meta gave "substantial assistance to the other in accomplishing a tortious result and [Meta's] own conduct, separately considered, constitutes a breach of duty to the third person." *McKay v. Hageseth*, 2006 WL 8443033, at *7 (N.D. Cal. May 24, 2006) (denying motion to dismiss under "the alternative formulation of the standard for aiding and abetting" based on "duty to use reasonable care with respect to foreseeable users of [defendant's] internet business"). Here, Meta substantially assisted the fraud for the reasons set forth in the preceding section. Further, as set forth below (*see* §§ IV, V), Meta owed both contractual duties and a duty of care to the Class, as users of Meta's services, which Meta breached by facilitating fraud on its platforms. These allegations independently establish an aiding and abetting claim.

## IV.    META BREACHED ITS CONTRACTUAL OBLIGATIONS

Meta's ToS and the policies incorporated therein constitute a binding contract. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 786 (N.D. Cal. 2022). Defendant argues that the provisions Plaintiffs allege Meta breached here do not constitute enforceable "obligations" (Mot. at 18), but Defendant's arguments mischaracterize both Plaintiffs' claims and the provisions at issue.

Plaintiffs' claims are not based on Meta's purportedly "aspirational" statement that it "aim[s] to protect users and businesses" from harmful content, but rather on Meta's express representations about what it does to identify and remove violating content.[6] *See* Compl. Ex. B at 1. Meta represents that "[t]he services [it] provide[s]" include using "dedicated teams around the world" and "advanced technical systems to detect potential misuse of our Products [and] harmful conduct towards others . . . , including to respond to user reports of potentially violating conduct." Compl. Ex. A at 3-4. Meta's Community Standards state in no uncertain terms that "[i]f content goes against our policies, we take action on it" (¶ 106) and that Meta "remov[es] content and combat[s] behavior that purposefully employs deceptive means—such as willful misrepresentation, stolen information and

---

[6] Meta's conduct fell short of the "aspirational" statements in any event. Meta did not "aim" to protect users from scam ads; it deliberately allowed those ads to proliferate to bolster its revenues.

exaggerated claims—to either scam or defraud users and businesses, or to drive engagement." Compl. Ex. B at 1.[7] Additionally, Meta's Advertising Policies state that ads are subject to a review process to monitor "for violations of our policies," which "starts automatically." ¶¶ 111-112.

Plaintiffs' allegations demonstrate that Meta failed to perform its contractual promises. Instead of reviewing ads for compliance and "tak[ing] action" to remove violating content, Meta systematically allowed scam ads to enhance its revenue stream, including by: (i) allowing ads to run when Meta knew with 95% certainty that they were fraudulent; (ii) allowing ad clients to accumulate 500 violations before removing them from its platforms; (iii) charging premium rates to suspected scammers; and (iv) disbanding an anti-scam unit and refusing to implement identity verification procedures despite knowing the efficacy of such measures. ¶¶ 43-55, 115 n.41. Even insofar as Meta implemented ad review systems, those systems were not designed to "detect potential misuse . . . [or] harmful conduct" or "violations of [Meta] policies" because the standards applied were so lenient that fraudulent ads routinely were allowed to be posted, resulting in *15 billion scam ads* on Facebook and Instagram at the time Plaintiffs and the Class were targeted by the JYD scammers. ¶¶ 46-47. Even when victims reported ads that facially violated Meta's policies and informed Meta that the ads were being used in furtherance of a fraudulent scheme, Meta did not "take action" or "remov[e]" the ads, contrary to its promise to "respond to user reports of violating conduct." ¶¶ 101, 106-118.[8]

Courts have held similar allegations sufficient at the pleadings stage to state a claim for breach of contract. In *Calise*, the court denied a motion to dismiss where the plaintiffs alleged that Meta permitted scam ads on its platforms in breach of substantially the same ad review and content removal

[7] These express representations regarding Meta's role in removing violating content belie Defendant's contention that the Community Standards only govern user behavior and do not impose any obligations on Meta. *See Calise v. Meta Platforms, Inc.*, No. 4:21-cv-6186-JSW, Dkt. No. 62 at 5 (N.D. Cal. Sept. 22, 2025) (rejecting argument that ToS only govern user behavior).

[8] Meta cites self-serving statements made by its representatives in news reports. *See* Mot. at 4-5 (repeating quotes attributed to VP of Communications Andy Stone and other unspecified Meta spokespeople). Meta's assertions are inconsistent with key findings in those reports regarding deficiencies in the company's ad-review policies and systems based on review of internal documents and other sources. *See* ¶¶ 40-48, 51-55. Far from supporting dismissal, Meta's reliance on its own hearsay statements at most highlights a factual dispute regarding its compliance with its contractual commitment to combat scam ads, which must be resolved through discovery.

provisions of the ToS and Community Standards Plaintiffs rely upon here. *Calise*, No. 4:21-cv-6186-JSW, Dkt. No. 62 at 1-2. Similarly, in *Doe v. Meta Platforms, Inc.*, the court held plaintiffs stated a claim for breach of contract where plaintiff alleged, like Plaintiffs do here, that Meta represented in its ToS that it "employ[ed] dedicated teams around the world" and "develop[ed] advanced technical systems" to detect and prevent misuse of user-provided information, but it did not, in fact, use its personnel and technology for that purpose. 690 F. Supp. 3d 1064, 1085 (N.D. Cal. 2023).[9]

Meta's insertion of the word "may" into the ToS (apparently in response to *Calise*) does not absolve it of liability for failing to perform the monitoring and review services it promised. Meta states without qualification that it "take[s] action on" content that violates its policies. ¶ 103. While the ToS list potential actions that Meta "may" take based on its assessment (Compl. Ex. A at 4), the ToS cannot reasonably be read to mean that Meta will take ***no action at all*** where content plainly violates its policies, particularly in the context of accompanying statements that it "do[es] not allow" such content. Compl. Ex. B at 2-3; ¶ 105. Although Meta's Community Standards contemplate that there may be a measure of discretion whether some content is or is not allowed, the scam ads at issue here fall squarely within the category of content that is ***strictly prohibited***. ¶¶ 104-108.

Nor does the purported "disclaimer" in the ToS insulate Meta from liability. *See* Mot. at 19. Plaintiffs' claims are not based on any "guarantee" that Meta's platforms will "always be . . . error free." Rather, Plaintiffs allege that Meta knowingly and systematically breached its own monitoring and review process and actively facilitated the creation of ads that facially violate its policies. *See Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 685 (N.D. Cal. 2021) (general disclaimer that product may not be "error-free" is "nowhere near specific and unambiguous enough" to excuse company's failure

---

[9] Defendant's cases are entirely distinguishable. In *Isgur v. Meta Platforms, Inc.*, plaintiffs sued Meta after their accounts were hacked, but they relied only on a generalized statement that Meta "work[s] hard to maintain . . . security," and unlike here, they did not identify any specific representations regarding Meta's systems and resources that it failed to implement. 2026 WL 194640, at *2, *6-7 (N.D. Cal. Jan. 26, 2026); *see also Young v. Facebook, Inc.*, 2010 WL 4269304, at *3 (N.D. Cal. Oct. 25, 2010) (failing to identify any term of ToS that Meta breached).

to perform its services).[10] Nor do Plaintiffs seek to hold Meta liable for "what people and others do or say." Plaintiffs' claims are based on Meta's own conduct—namely, its failure to perform the promised monitoring and review services and its material contribution to violating content.[11]

## V.  PLAINTIFFS ADEQUATELY ALLEGE ALTERNATIVE CLAIMS

Alternatively, Meta's decision to facilitate scam ads on its platforms notwithstanding its representations that it "do[es] not allow" such content gives rise to liability for breach of the covenant of good faith and fair dealing and promissory estoppel.

### A.  Good Faith and Fair Dealing

The covenant of good faith and fair dealing prevents one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement. *See Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (2012). The ToS promised that Meta would implement a system to "combat harmful conduct and keep our community of users safe," including "dedicated teams" and "advanced technical systems to detect potential misuse [and] harmful conduct toward others." ¶ 101. Even if Meta engaged in *some* content monitoring and moderation, it did not perform its promised contractual duties in good faith. Rather than seeking to "combat harmful conduct," Meta allowed ads even when its screening tool determined with up to 95% certainty that the ad was fraudulent and by allowing customers to accrue as many as 500 violations before removing them from the platform. ¶ 47. Meta's decision to allow scam ads on its platform—despite representing that such content was "not allowed," ¶ 104—smacks of bad faith and gives rise to liability pursuant to the covenant of good faith and fair dealing, even if it did not breach an express contract term.

---

[10] Again, Defendant's cases are distinguishable. *Pete v. Facebook Data Breach* involved a pro se plaintiff who did not address the disclaimer and instead submitted a brief about Article III standing. 2026 WL 32635, at *1-2 (N.D. Cal. Jan. 6, 2026). In *Barfuss v. Live Nation Ent., Inc.*, plaintiffs claimed they were entitled to an access code to participate in the pre-sale of concert tickets because they had purchased merchandise, but the alleged contract expressly stated that purchase would "not increase" chances of getting presale access. 2025 WL 1843207, at *5 (C.D. Cal. May 14, 2025).

[11] Meta's disclaimer is legally invalid because it purports to extinguish liability for Meta's breach of express contractual obligations, because Meta engaged in intentional conduct, and because the disclaimer is procedurally and substantively unconscionable. *See Gross v. Symantec Corp.*, 2012 WL 3116158, at *11 (N.D. Cal. July 31, 2012) ("California courts generally regard warranty disclaimers as void when they contradict the express terms of the alleged warranty."); *Gerber v. Twitter, Inc.*, 2024 WL 5173313, at *6-8 (N.D. Cal. Dec. 18, 2024).

### B.    Promissory Estoppel

Promissory estoppel is an alternative remedy because Plaintiffs reasonably relied on Meta's representations that it has policies and procedures to detect and remove scam ads when they consented to allow Meta to show them ads in order to participate on Meta's platforms. ¶¶ 164-169. Meta's contention that Plaintiffs have not pleaded reasonable reliance raises questions of fact that cannot be resolved at this stage. *See* Mot. at 21. Meta's purported "disclaimer" did not inform Plaintiffs that it was deliberately facilitating scam ads on its platforms or preclude Plaintiffs from reasonably believing that Meta was implementing the ad review and content removal procedures described in the ToS. Contrary to Meta's assertions, Plaintiffs are permitted to plead both breach of contract and promissory estoppel claims where, as here, there is a dispute about the terms or validity of the alleged contract. *See Rowland v. JPMorgan Chase Bank, N.A.*, 2014 WL 992005, at *6 (N.D. Cal. Mar. 12, 2014).

## VI.    DEFENDANT WAS NEGLIGENT

To state a claim of negligence, plaintiffs must allege (i) duty, (ii) breach of duty, (iii) causation, and (iv) damages.  *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 754 F. Supp. 3d 946, 972 (N.D. Cal. 2024). Meta challenges only the elements of (i) duty and (iv) damages, and its arguments fail.

### A.    Meta Engaged in Misfeasance

"The general rule in California is that everyone is responsible for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person. In other words, each person has a duty to use ordinary care and is liable for injuries caused by his failure to exercise reasonable care in the circumstances." *Forrest*, 737 F. Supp. 3d at 820; *see also* Cal. Civil Code § 1714. Courts may depart from the general rule only if the *Rowland* factors support an exception, but Meta does not argue that an exception should be made. Instead, it argues only that the allegations amount to "nonfeasance," which requires a "special relationship" to allege. *See* Mot. at 22. Meta's argument is unavailing because Plaintiffs allege malfeasance, not mere nonfeasance.

The Complaint makes clear and extensive allegations regarding Meta's knowing and affirmative conduct underlying the negligence claim, including that Meta deliberately cultivated relationships with scammers, adopted lenient policies to allow scam ads to proliferate, created the

scam ads for the JYD scammers, optimized them to have the most impact, and targeted the ads based on personal factors known only to Meta about its users. The difference between malfeasance and nonfeasance is ultimately whether "defendant makes the plaintiff's position worse" or simply "does not help a plaintiff." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1100. (9th Cir. 2019). Here, the JYD Scheme was made possible *only* by Meta's active participation through its (1) design, optimization, and targeting of the ads; (2) knowledge of the Class's personal attributes; and (3) willingness to continue to do business with known fraudsters. Such conduct amounts to affirmative malfeasance. *See Bouck*, 2026 WL 810036, at *9 (allegation "that Meta actively assisted in the creation of the fraudulent advertisements, thereby making their position worse" amounted to malfeasance).

Meta mischaracterizes Plaintiffs' claims in contending that they seek to hold Meta responsible for failing to prevent wrongdoing by others. *See* Mot. at 21. Plaintiffs' claims are based on Meta's own acts. *See Forrest*, 737 F. Supp. 3d at 821 (rejecting argument as "a premature factual retort"). Meta's effort to convert affirmative misconduct into "nonfeasance" is baseless and unsupported by its case citations. *Dyroff*, 934 F.3d at 1094-95 (involving website where anonymous users "interacted with other users about different topics," the "site did not limit or promote the types of experiences users shared," and "the site did not collect users' identifying information"); *see also Bouck*, 2026 WL 810036, at *9 (rejecting argument as "a repackaged version of its section 230 argument").

**B.      The Economic Loss Doctrine Does Not Bar Plaintiffs' Claim**

The economic loss doctrine has no application here because Plaintiffs' negligence claims arise from Meta's active role in creating and facilitating the scam ads, which is unrelated to any contract between the parties. *See Bouck*, 2026 WL 810036, at *9. Meta's argument that *Bouck* "ignores that the disclaimer [covers] this conduct" (Mot. at 24) is belied by the plain language of the disclaimer, which expressly applies to *third-part*y conduct, whereas Plaintiffs' claims arise from *Meta's* conduct. *See* Compl. Ex. A at 10 (§ 4.3) (Meta "do[es] not contract or direct what *people and others* do or say"). Thus, Plaintiffs' negligence claims are "independent of," and not "coextensive with," their contract claims, and Defendant's reliance on *Sheen* and the recent order in *Calise* is misplaced. *See*

*Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 925 (2022); *Calise*, No. 4:21-cv-6186-JSW, Dkt. No. 62 at 11-12.

The doctrine also does not apply because the only contract at issue is one for service (*i.e.*, the ToS), and an exception to the economic loss doctrine applies if the contracts are for services and the parties have a "special relationship." *See J'Aire Corp. v. Gregory,* 24 Cal. 3d 799, 804 (1979). The factors for determining a special relationship are: (1) the intent to affect the plaintiff; (2) the foreseeability of harm to the plaintiff, (3) the certainty that the plaintiff suffered injury; (4) the connection between defendant's conduct and the injury; (5) the defendant's moral blame; and (6) the policy of preventing future harm. *Id*. All factors support finding a special relationship in this case.[12] Meta facilitated that effect through its ad optimization and targeting efforts, and the resulting harm was both foreseeable and caused with certainty. Further, Meta deserves moral blame, and policy reasons support finding liability here.

Lastly, the economic loss doctrine does not apply because Plaintiffs allege non-economic damages for emotional distress, as Meta's own authorities recognize. *See Gerber*, 2024 WL 5173313, at *6 (economic loss doctrine did not apply because plaintiffs alleged "non-economic injuries").

## VII.   <u>META IS LIABLE FOR UNJUST ENRICHMENT</u>

The elements for a claim of unjust enrichment are "receipt of a benefit and unjust retention of the benefit at the expense of another." *Precisely Software Inc. v. Loqate Inc.*, 2022 WL 4348469, at *3 (N.D. Cal. Sept. 19, 2022). A party that "is unjustly enriched at the expense of another is subject to liability in restitution." *Fenerjian v. Nongshim Co., Ltd.*, 2014 WL 5685562, at *19 (N.D. Cal. Nov. 4, 2014). Here, Meta was enriched at the expense of Plaintiffs because the scam ads generated revenue for Meta and resulted in enormous financial losses and other damages to Plaintiffs and the

---

[12] Defendant's case law is unpersuasive. In *Olson v. Children's Home Society*, the issue was whether "there was a nexus between the impending peril and the specific duties undertaken by the defendants in [] special relationships." 204 Cal. App. 3d 1362, 1366, 252 Cal. Rptr. 11 (Ct. App. 1988). Here, Plaintiffs' injuries were undoubtedly foreseeable given Meta's development and facilitation of the advertisements. Similarly, in *Doe No. 14 v. Internet Brands, Inc.*, "Plaintiff [did] not allege that [defendant's] actions somehow created the risk … or made [plaintiff's] position, by its actions, worse." 2016 WL 11824793, at *4 (C.D. Cal. Nov. 14, 2016).

Class. ¶¶ 178-182. Allowing Meta to retain the revenues from those ads would be unjust and inequitable, and Plaintiffs and the Class are entitled to disgorgement of all of Meta's unjust profits.

The existence of a contract does not preclude a claim for unjust enrichment. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015); *see also Bouck*, 2026 WL 810036, at *11 ("Plaintiffs [] are permitted to plead a claim for breach of contract and a claim for breach of a quasi-contract seeking restitution in the alternative."). In any event, Plaintiffs' unjust enrichment claim provides another alternative basis for relief in the event the Court dismisses their breach of contract claim (which it should not) based on Defendant's arguments that the contractual provisions at issue do not constitute an "enforceable promise" and do not impose any obligations on Meta (*see* Mot. at 17-18), in which case there would be no "enforceable agreement" on the relevant subject matter to bar Plaintiffs' unjust enrichment claim. *See id.* at 25.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendant's Motion to Dismiss be denied in its entirety. Insofar as the Court grants the Motion in whole or in part, Plaintiffs respectfully submit that such dismissal should be without prejudice and with leave to amend.

Dated: May 20, 2026          */s/ Andrew W. Robertson*

**MORRIS KANDINOV LLP**
Leonid Kandinov (279650)
550 West B Street, 4th Floor
San Diego, CA 92101
Tel. (619) 780-3993
leo@moka.law

**MORRIS KANDINOV LLP**
Aaron T. Morris
Andrew W. Robertson (admitted *pro hac vice*)
William H. Spruance
305 Broadway, 7th Floor
New York, NY 10007
Tel. (212) 431-7473
aaron@moka.law
andrew@moka.law
william@moka.law

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of May, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

*/s/ Andrew W. Robertson*