**WILMER CUTLER PICKERING HALE AND DORR LLP**
SONAL N. MEHTA (SBN 222086)
JESSICA LEWIS (SBN 302467)
MADEEHA DEAN (SBN 340563)
Sonal.Mehta@wilmerhale.com
Jessica.Lewis@wilmerhale.com
Madeeha.Dean@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

ARI HOLTZBLATT (SBN 354631)
Ari.Holtzblatt@wilmerhale.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6443

*Attorneys for Defendant*
*Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHONY IRVING, et al., | Case No. 3:26-cv-01127-WHO |
| Plaintiffs, | **DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT** |
| v. | |
| META PLATFORMS, INC., | Judge: Hon. William H. Orrick |
| Defendant. | Courtroom 2, 17th Floor |
| | Date: July 8, 2026 |
| | Time: 2:00 PM |

**TABLE OF CONTENTS**

I.   Plaintiffs' Attempts To Circumvent Section 230 Fail ...........................................................1

   A.   Plaintiffs Do Not Plausibly Allege Material Contribution ......................................1

   B.   Plaintiffs' Contract and Related Claims Do Not Evade Section 230.......................4

   C.   Section 230 Bars Plaintiffs' "Failure To Warn" Theory Of Negligence .................5

II.  If Section 230 Does Not Bar Plaintiffs' Claims, SLUSA Does...........................................5

   A.   SLUSA's "In Connection With" Requirement Is Satisfied .....................................6

   B.   Barring Plaintiffs' State Law Claims Is Consistent With SLUSA's
      Purposes ..................................................................................................................8

III. Plaintiffs' Claims Fail Independent Of The Federal Statutory Bars....................................9

   A.   Plaintiffs Do Not Plausibly Allege Aiding-And-Abetting Fraud ...........................9

   B.   Plaintiffs Do Not Plausibly Allege Their Contract And Related Claims...............11

   C.   Plaintiffs Do Not Plausibly Allege Negligence ....................................................13

   D.   Plaintiffs Do Not Plausibly Allege Unjust Enrichment ........................................15

IV.  Dismissal Should Be With Prejudice..................................................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abada v. Charles Schwab & Co.*,
    127 F. Supp. 2d 1101 (S.D. Cal. 2000)......................................................................................7

*Ambassador Hotel Co. v. Wei-Chuan Investment*,
    189 F.3d 1017 (9th Cir. 1999) ...................................................................................................8

*Anderson v. Edward D. Jones & Co., L.P.*,
    990 F.3d 692 (9th Cir. 2021) .....................................................................................................7

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) .................................................................................................11

*Barrett v. Apple Inc.*,
    523 F. Supp. 3d 1132 (N.D. Cal. 2021) ..............................................................................10, 11

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................................13

*Bhatia v. Silvergate Bank*,
    725 F. Supp. 3d 1079 (S.D. Cal. 2024)....................................................................................10

*Bouck v. Meta Platforms, Inc.*,
    2026 WL 810036 (N.D. Cal. Mar. 24, 2026)................................................................... *passim*

*Bouck v. Meta Platforms, Inc.*,
    2026 WL 1697631 (N.D. Cal. June 11, 2026)................................................................. *passim*

*Bradshaw v. SLM Corp.*,
    652 F. App'x 593 (9th Cir. 2016) ...............................................................................................9

*Calise v. Meta Platforms, Inc.*,
    103 F.4th 732 (9th Cir. 2024) ...............................................................................................4, 12

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) ...................................................................................................3

*Chadbourne & Parke LLP v. Troice*,
    571 U.S. 377 (2014)...................................................................................................................6

*Diaz v. Intuit, Inc.*,
    2018 WL 2215790 (N.D. Cal. May 15, 2018)........................................................................9, 10

*Doe v. Grindr Inc.*,
    128 F.4th 1148 (9th Cir. 2025) ...................................................................................................5

*Doe 1 v. Twitter, Inc.*,
   148 F.4th 635 (9th Cir. 2025) ................................................................................................4

*Doe v. Meta Platforms, Inc.*,
   690 F. Supp. 3d 1064 (N.D. Cal. 2023) ................................................................................12

*Ex parte McCardle*,
   7 Wall. 506 (1868) ..................................................................................................................1

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ................................................................................................3

*Fleming v. Charles Schwab Corp.*,
   878 F.3d 1146 (9th Cir. 2017) .............................................................................................6, 8

*Forrest v. Meta Platforms, Inc.*,
   737 F. Supp. 3d 808 (N.D. Cal. 2024) ................................................................................4, 15

*Foskaris v. Experian Information Solutions, Inc.*,
   808 F. App'x 436 (9th Cir. 2020) .........................................................................................15

*Gentry v. eBay, Inc.*,
   99 Cal. App. 4th 816 (2002) ...................................................................................................4

*Goddard v. Google, Inc.*,
   640 F. Supp. 2d 1193 (N.D. Cal. 2009) ...............................................................................2, 3

*Hampton v. Pacific Investment Management Co. LLC*,
   705 F. App'x 558 (9th Cir. 2017) ...........................................................................................8

*In re Edward Jones Holders Litigation*,
   453 F. Supp. 2d 1210 (C.D. Cal. 2006) ..................................................................................9

*In re First Alliance Mortgage Co.*,
   471 F.3d 977 (9th Cir. 2006) ................................................................................................10

*In re Robinhood Outage Litigation*,
   495 F. Supp. 3d 831 (N.D. Cal. 2020) ...................................................................................6

*In re Woodbridge Investments Litigation*,
   2020 WL 4529739 (C.D. Cal. Aug. 5, 2020).........................................................................10

*Isgur v. Meta Platforms, Inc.*,
   2026 WL 194640 (N.D. Cal. Jan. 26, 2026).................................................................5, 11, 15

*Kroetch v. BAC Home Loan Services*,
   2011 WL 4502350 (N.D. Cal. Sept. 27, 2011) .....................................................................13

*Liapes v. Facebook, Inc.*,
   95 Cal. App. 5th 910 (2023) ...............................................................................................3, 10

*Lim v. Charles Schwab & Co., Inc.*,
   2015 WL 7996475 (N.D. Cal. Dec. 7, 2015)................................................................5

*Lindstrom v. Jayud Glob. Logistics Ltd. et al.*,
   No. 1:25-cv-09662 (S.D.N.Y. Nov. 19, 2025)...........................................................8, 9

*Lloyd v. Facebook, Inc.*,
   2022 WL 4913347 (N.D. Cal. Oct. 3, 2022)................................................................11

*Marshall's Locksmith Service Inc. v. Google LLC*,
   925 F.3d 1263 (D.C. Cir. 2019).....................................................................................4

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006)..................................................................................................6, 8, 9

*Morton v. Twitter, Inc.*,
   2021 WL 1181753 (C.D. Cal. Feb. 19, 2021)..............................................................11

*O'Kroley v. FastCase*,
   831 F.3d 352 (6th Cir. 2016) ........................................................................................4

*Realtek Semiconductor Corp. v. LSI Corp.*,
   2013 WL 4778140 (N.D. Cal. Sept. 6, 2013) ..............................................................13

*Scala v. Citicorp Inc.*,
   2011 WL 900297 (N.D. Cal. Mar. 15, 2011)................................................................6

*Sheen v. Wells Fargo Bank, N.A.*,
   12 Cal. 5th 905 (2022) ...........................................................................................13, 14

*Steel Co. v. Citizens for a Better Environment*,
   523 U.S. 83 (1998).........................................................................................................1

*Young v. Facebook, Inc.*,
   2010 WL 4269304 (N.D. Cal. Oct. 25, 2010)..............................................................11

**Rules, Regulations, Statutes**

15 U.S.C. § 78u-4 (Private Securities Litigation Reform Act) (PSLRA)......................................8

47 U.S.C. § 230 (Communications Decency Act) ................................................................ *passim*

Plaintiffs' Opposition confirms their Complaint's persistent deficiencies: the alleged fraud was designed and carried out by third-party scammers, not Meta. Plaintiffs do not dispute the JYD "scammers used [Meta's] advertising tools … to target … Facebook and Instagram users." Compl. ¶ 128. Nor do they dispute it was the scammers—not Meta—that posed as advisors in WhatsApp groups. By contrast, Meta's alleged role is limited to providing content-neutral ad tools and failing to prevent scammers from misusing them. Even if Plaintiffs had plausibly alleged that *Meta* created the fraudulent ad content—they have not—their claims would trigger SLUSA's jurisdictional bar, as Judge Seeborg recognized last week in *Bouck v. Meta Platforms, Inc.*, 2026 WL 1697631 (N.D. Cal. June 11, 2026) ("*Bouck II*").[1] And independent of these statutory bars, Plaintiffs fail to allege essential elements of their claims. Dismissal without leave to amend is required.[2]

## I.    PLAINTIFFS' ATTEMPTS TO CIRCUMVENT SECTION 230 FAIL

Plaintiffs concede Meta is an interactive computer service provider, which satisfies prong one. *See* Opp. 6. Their Opposition focuses on Section 230's third prong and, to a lesser extent, prong two, and confirms that each is satisfied.

### A.    Plaintiffs Do Not Plausibly Allege Material Contribution

Plaintiffs rely on *Bouck v. Meta Platforms, Inc.*, 2026 WL 810036 (N.D. Cal. Mar. 24, 2026) ("*Bouck I*"), in support of material contribution. Opp. 7-10. *Bouck I* depended on the premise that "the fraudulent statements in the ads" were "created by Meta." 2026 WL 810036, at *5. Meta respectfully maintains that *Bouck I* was wrongly decided; the idea that Meta "created" the ads' fraudulent message conflicts both with Plaintiffs' allegations and on-point precedent.

Plaintiffs baldly claim Meta "develop[ed]," "determin[ed] the ultimate appearance of," or "created" the ads. But Plaintiffs cannot use mere labels to evade Section 230, which protects providers that "augment the content generally," or "facilitate the communication and content of others." Mot. 8-9. Instead, they must plausibly allege Meta "materially contribut[ed]" to "what

---

[1] If the Court dismisses for lack of jurisdiction under SLUSA, it should not reach the other substantive issues presented by this case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

[2] All emphasis is added and citations omitted unless noted otherwise.

makes the displayed content illegal." *Id.* And Plaintiffs' specific allegations make clear that the scammers alone provided the ads' allegedly unlawful message. Opp. 7-10. Specifically, Plaintiffs allege the "scammers used [Meta's] advertising tools to deploy … advertisements … to target" Meta's users. Compl. ¶ 128; *id.* ¶ 10 ("scammers … target[ed] victims" using "Meta's advertising tools"). And they concede it was "scammers posing as financial professionals"—not Meta—that "engaged with victims" in the encrypted WhatsApp groups. Opp. 2. In short, Plaintiffs concede the scammers—not Meta—supplied the fraudulent message of the challenged ads.

Plaintiffs rely heavily on ad tools Meta makes generally available to advertisers. But even *Bouck I* does not support the conclusion that the Flexible Format or Dynamic Creative tools suffice for material contribution. Plaintiffs concede the Flexible Format tool selects ad formats and placements for content *an advertiser provides*. Mot. 9; Opp. 9. They similarly concede that the Dynamic Creative tool "mix[es] and match[es]" *advertiser-provided* content. Mot. 9; Opp. 9. *Bouck I* found material contribution where a tool was supposedly alleged to "literally generat[e] … the images and text in the advertisements." 2026 WL 810036, at *4. Because neither of these tools are alleged to generate ad content, they provide no basis for circumventing Section 230.

As for the Advantage+ Creative tool, Plaintiffs do not dispute two key characteristics that refute their position. *First*, they concede the alleged variations the tool suggests are published only if the advertiser reviews them, selects them, and clicks "publish." Mot. 3; Opp. 9. Offering "neutral tools" that "provide options that advertisers may adopt or reject at their discretion" is not material contribution. *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198 (N.D. Cal. 2009). Even the reporter's experiment on which Plaintiffs rely claims the tool presented variants of the reporter's initial inputs that he was free to, and did, "decline[]."[3] *Second*, Plaintiffs do not dispute that the tool suggests "creative enhancements" to *advertiser-provided* content that "maintain[]" the *advertiser*'s "core message." Mot. 9; Opp. 9. Courts have repeatedly held that Section 230 bars claims when a neutral tool does nothing more than translate or transform underlying third-party content without changing that content's core message. *See* Mot. 10.

---

[3] Horwitz, *Meta's "Trusted Experts" helped me run scam ads on Facebook and Instagram*, REUTERS (Dec. 15, 2025), https://tinyurl.com/58ucf2z3.

Plaintiffs' attempts to distinguish *Carafano* and *Goddard* fail. Both cases recognize it is not material contribution for content-neutral tools to suggest alternative ways of conveying a third party's message, where the "selection of the content was left exclusively to the [third party]." *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003). Plaintiffs attempt to distinguish *Carafano* as *Bouck I* did, based on the mistaken view that the website in *Carafano* "did not endeavor to create the information itself." *Bouck I*, 2026 WL 810036, at *5; Opp. 9. But the *Carafano* website *did* create "pre-set questions" *and* "a menu of possible responses to those questions" that third parties could select from. *Bouck I*, 2026 WL 810036, at *4; *accord Carafano*, 339 F.3d at 1121, 1125. It is thus incorrect that the *Carafano* website did not create any of the offending content or that its creation was material to Section 230. *Id.* Instead, what mattered was whether "the *selection* of the content" "was left exclusively to the user." *Id.* at 1124.

Plaintiffs similarly attempt to distinguish *Goddard*—which *Bouck I* did not address—but distort its holding with truncated quotations. *Goddard* did not hold that Section 230 would fall away if plaintiffs had alleged Google "collaborate[d] in the development of the illegal content." Opp. 10. Instead, *Goddard* rejected the theory that Google's alleged "collaboration" rose to the level that it "effectively[] *require[d]* its advertiser customers to engage in" illegal conduct. 640 F. Supp. 2d at 1196. Here, Plaintiffs have likewise not alleged "control[] or compulsion" by Meta on advertisers to publish automatically generated variations. *Id.* at 1198; *see also Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 930 (2023) (site "would be immune, so long as it does not *require*" unlawful content). That is also the key distinction between cases like *Goddard* and *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*; as *Goddard* observed, "[t]he Ninth Circuit's partial denial of immunity to the website [in *Roommates*] turned entirely on the website's decision to *force* subscribers" to create unlawful content, rather than offering "discretion" whether to accept options. 640 F. Supp. 2d at 1198. Who "pushes the last button" may not matter when, as in *Roommates*, the button-pusher has no choice, 521 F.3d 1157, 1166-1167 (9th Cir. 2008), but under *Carafano* and *Goddard*, when a user has *discretion* whether to publish automatically generated options, the website providing those options remains protected by Section 230.

Plaintiffs barely acknowledge the case law Meta cited holding that material contribution

cannot be established when a neutral tool transforms underlying third-party content without changing that content's core message. Confining their response to a single footnote, Plaintiffs do not dispute that plaintiffs in these cases challenged tools that translated or transformed third-party content. Opp. 8 n.2. Instead, they argue the plaintiffs did not attempt to establish material contribution. That is wrong. The scope of the platforms' contributions to third-party content was the core issue. *See Marshall's Locksmith Serv. Inc. v. Google LLC*, 925 F.3d 1263, 1268-1269 (D.C. Cir. 2019) (immunity for "map pinpoints" that "translat[ed] information … from the scam locksmiths' webpages"); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 834 (2002) (whether eBay "create[d] or develop[ed] the underlying misinformation"); *O'Kroley v. FastCase*, 831 F.3d 352, 355 (6th Cir. 2016) ("Nor did Google's alterations 'materially contribute to the alleged unlawfulness of the content.'"); *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 744-745 (9th Cir. 2024) ("assistance" to scam advertisers not material contribution); *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 646 (9th Cir. 2025) ("alleged third-party abuses of [Twitter's] hashtag and search functions").

*Forrest v. Meta Platforms, Inc.* does not help Plaintiffs. 737 F. Supp. 3d 808 (N.D. Cal. 2024); Dkt. 29 at 14. The plaintiff there did "not clearly allege how Meta's ad tools work or contribute to the challenged ads," creating a "factual dispute." 737 F. Supp. 3d at 818. But the Court need not find Plaintiffs' allegations are "erroneous" to dismiss. *Id.* Instead, Plaintiffs' allegations, *taken as true*, show that Section 230 bars their claims. Plaintiffs allege (1) both Flexible Format and Dynamic Creative merely organized or formatted advertiser-provided content; (2) all Meta's ad tools transformed or translated third-party content using automated processes that maintained the content's "core message" and worked the same regardless of content; and (3) to the extent Advantage+ Creative created supposedly "new" content, whether to publish that content was left entirely to the third-party user's discretion. *Supra* p.2; Opp. 7-8.

### B.    Plaintiffs' Contract And Related Claims Do Not Evade Section 230

Plaintiffs concede Section 230's second prong is satisfied for most of their claims, but argue their "contract-based claims" would impose liability on Meta as a promisor, not a publisher. *See* Mot. 6-7; Opp. 10-11. But they do not plausibly allege Meta "manifested its intent to be legally obligated to" moderate content, *Calise*, 103 F.4th at 743; Mot. 7; *see infra* pp.11-13. Nor do they

account for the rejection of their position by *Bouck I* and by this Court in an analogous case. *See Isgur v. Meta Platforms, Inc.*, 2026 WL 194640 (N.D. Cal. Jan. 26, 2026). Because they allege no enforceable promise, they cannot circumvent Section 230. *See infra* pp.11-13.

### C.    Section 230 Bars Plaintiffs' "Failure To Warn" Theory Of Negligence

Plaintiffs further argue Section 230 does not apply to "part" of their negligence claim alleging failure to "warn users of the proliferation of scam advertisements" on Meta's services. Opp. 11. *Doe v. Grindr Inc.* rejected that argument; a provider's "role as a publisher of third-party content does *not* give it a duty to warn users of 'a general possibility of harm' resulting from" its services. 128 F.4th 1148, 1154 (9th Cir. 2025). Such a duty arises only if "'the provider is aware of a 'known conspiracy operating independent of the site's publishing function,'" and the claim is "not based on the defendant's failure to remove any user content or … publishing or monitoring of third-party content." *Id.* Because this claim depends on supposed "proliferation of scam advertisements" on Meta's services, Opp. 11, "§ 230 bars this claim." *Grindr*, 128 F.4th at 1154.

## II.    IF SECTION 230 DOES NOT BAR PLAINTIFFS' CLAIMS, SLUSA DOES

As *Bouck II* correctly held, "Plaintiffs' theory of the case" means that if Section 230 does not bar their claims, SLUSA does. 2026 WL 1697631, at *1. As in *Bouck II*, Plaintiffs concede their claims satisfy four of SLUSA's five statutory requirements. They do not dispute the first, second, and fifth requirements ("covered class action," state law claims, and "covered security"), nor do they dispute the third requirement (misrepresentation) as they claim Meta created the fraudulent ad content and thus concede Meta's alleged "'deceptive statements or conduct form the gravamen or essence of [their] claim.'" Mot. 12 (quoting *Lim v. Charles Schwab & Co., Inc.*, 2015 WL 7996475, at *5 n.4 (N.D. Cal. Dec. 7, 2015)). Plaintiffs contest only the fourth requirement ("in connection with"). That reduces their argument to the following: Although Meta purportedly created fraudulent ads that caused Plaintiffs to be injured by purchasing JYD shares, those ads were not "in connection with" the JYD purchases. That argument is irreconcilable with either the law or Plaintiffs' own positions. As alleged, "[t]hough the fraudulent statements did not mention [JYD], they were integral to Plaintiffs' decision to purchase the shares, and it is those purchases which form the basis of their injury." *Bouck II*, 2026 WL 1697631, at *1. SLUSA thus applies.

## A.   SLUSA's "In Connection With" Requirement Is Satisfied

Plaintiffs incorrectly argue their claims evade SLUSA's "in connection with" requirement. *First*, Plaintiffs argue this requirement is not satisfied because "Meta did not make any representations about JYD securities or induce any Plaintiff to purchase those shares." Opp. 14-15. There is no requirement that the alleged misrepresentation itself mention the specific security. As *Bouck II* recognized, "[t]he Ninth Circuit … eschewed such a requirement in *Fleming v. Charles Schwab Corporation*," 2026 WL 1697631, at *4, where the alleged misrepresentation— that the defendant "would deliver best execution of [Plaintiffs'] trades"—was untethered to the sale of any particular security, *Fleming*, 878 F.3d 1146, 1154 (9th Cir. 2017). It did not matter that "the promise of best execution d[id] not induce clients to trade a *particular* security." *Id.* at 1156; *Bouck II*, 2026 WL 1697631, at *4 ("[A] misstatement can be material even if it does not mention the security by name."). Instead, "SLUSA requires only that 'the misrepresentation makes a significant difference to someone's decision to purchase or to sell a covered security.'" *Fleming*, 878 F.3d at 1156 (quoting *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387-388 (2014)).

This aligns with *Scala v. Citicorp Inc.*, 2011 WL 900297 (N.D. Cal. Mar. 15, 2011). Plaintiffs wrongly suggest *Scala* was superseded because it construed SLUSA "very broad[ly]," based on *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006). Opp. 13-14. But *Troice* expressly did not modify *Dabit*; it reaffirmed that "the 'in connection with' requirement … *must be read broadly*." 571 U.S. at 387. Plaintiffs try to distinguish *Scala* on "superficial" facts, e.g., that Meta is not a financial institution. *Bouck II*, 2026 WL 1697631, at *4. But focusing on Meta's business, rather than the connection between its alleged conduct and the purchase of JYD shares, misses what matters: the nexus between the alleged conduct and the share purchases. *Bouck II* rejected the same "attempts to dig *Scala*'s grave" that Plaintiffs try here. *Id.* at *4.

As *Bouck II* recognized, Plaintiffs' cases are not to the contrary. *See* 2026 WL 1697631, at *4-6. In each, SLUSA did not apply because plaintiffs claimed losses from something other than the purchase or sale of a covered security. *In re Robinhood Outage Litig.* involved a "complaint … based entirely on the allegation that Robinhood promised users … best-in-class technology, and failed to deliver it" due to a "systems crash." 495 F. Supp. 3d 831, 834-835 (N.D. Cal. 2020).

In *Anderson v. Edward D. Jones & Co., L.P.*, the plaintiff was allegedly duped into a high-fee brokerage account but did not claim he would have "purchased or sold different covered securities" with a lower-fee account. 990 F.3d 692, 702-703, 705 (9th Cir. 2021). And in *Abada v. Charles Schwab & Co.*, the "defendant's conduct had nothing to do with the trading of any particular security"; the loss resulted from Schwab's "technical inability" to process an order. 127 F. Supp. 2d 1101, 1103 (S.D. Cal. 2000).

*Second*, beyond misstating the law, Plaintiffs' claim that they do not allege Meta "induced any Plaintiff to purchase JYD shares," Opp. 15, attempts to recast the alleged facts in a way that renders their case unrecognizable, and cannot be reconciled with the Complaint or the rest of their Opposition. Plaintiffs have repeatedly claimed they were injured solely because they purchased JYD shares whose value collapsed and that Meta was responsible for that injury because of its supposed contributions to the ads that caused Plaintiffs to make those purchases. The Complaint repeatedly describes "Meta's role," the challenged ads, WhatsApp communications, and manipulation of the JYD share price as part of a single "JYD Scheme." Compl. at 1 & ¶¶ 1, 20-23, 93-94, 96, 130, 142, 146, 148, 153, 166, 173, 182-183. It alleges that this "case arises from *Meta's role* in enabling, facilitating, and materially contributing to a stock manipulation scheme [the 'JYD Scheme'] that *used advertisements created by Meta* and distributed through … Facebook and Instagram …, and [] WhatsApp …, to extract millions of dollars from unsuspecting victims," *id.* ¶ 1; that "Meta's advertising tools were the *primary means through which the scheme was implemented*," *id.* ¶ 18; and that the scheme was "designed to manipulate the price of JYD shares," *id.* ¶ 142. And the Complaint uses the *very* language of SLUSA—"in connection with"— to describe the ads as part of this security-based scheme. *Id.* ¶¶ 20, 153, 182-183. Indeed, Plaintiffs call the challenged ads "an *essential* element used to lure Plaintiffs … into purchasing large amounts of JYD shares." *Id.* ¶ 143. And Plaintiffs' Opposition calls the challenged ads the "JYD ads," Opp. 17, and claims "the scam *ads ... resulted in [Plaintiffs'] financial losses*" from buying the inflated JYD stock, *id.* at 24. Having repeatedly claimed Meta's conduct was part of a single, unified scheme that caused Plaintiffs to purchase JYD shares, they cannot now try to draw a sharp line between those ads and their eventual purchase of the shares to avoid SLUSA.

*Finally*, Plaintiffs "cannot have it both ways" when it comes to causation. *See Fleming*, 878 F.3d at 1156 (rejecting "claim that [defendant's] failure to [fulfill fraudulent promise] impacted [plaintiffs'] securities trades while simultaneously claiming that the breach of duty is not 'in connection with' those trades"); *Bouck II*, 2026 WL 1697631, at *6 (same). Plaintiffs' own authority confirms this point. SLUSA's "in connection with" requirement turns on whether there is "some causal connection between the fraud and the securities transaction in question." *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999). "[E]ither the misrepresentations mattered (in which case SLUSA applies) or they did not (in which case their claims fail on the merits)." *Bouck II*, 2026 WL 1697631, at *6.

**B.      Barring Plaintiffs' State Law Claims Is Consistent With SLUSA's Purposes**

Perhaps recognizing the weakness of their position, Plaintiffs lead the SLUSA portion of their brief with freestanding policy arguments. Opp. 12. But they do not—and cannot—cite any authority to support their suggestion that the Court could decline to apply SLUSA based on free-floating policy considerations untethered to its statutory requirements. SLUSA's jurisdictional bar applies where those statutory requirements are satisfied, none of which considers the merits of the claims at issue or the extent of the alleged harm.

To the extent policy matters, it cuts against Plaintiffs. SLUSA ensures Congress's preference for "national standards for securities class action lawsuits involving nationally traded securities." *Dabit*, 547 U.S. at 86-87. It prevents "members of the plaintiffs' bar" from "bringing class actions under state law" "[r]ather than face the obstacles set in their path by" the Private Securities Litigation Reform Act ("PSLRA"). *Id.* at 82. SLUSA is intended to be construed broadly so that plaintiffs cannot "circumvent Congress's purpose 'through artful pleading that removes the covered words but leaves in the covered concepts.'" *Hampton v. Pac. Inv. Mgmt. Co. LLC*, 705 F. App'x 558, 559-560 (9th Cir. 2017). SLUSA was aimed at preventing "parallel class actions … with different standards governing claims asserted on identical facts." *Dabit*, 547 U.S. at 86-87.

Here, Plaintiffs' claims are duplicative with an existing federal securities class action governed by the PSLRA to recover for a class allegedly harmed by the same JYD trading losses. *Compare* Compl. ¶ 132, *with* Compl. ¶¶ 1, 4, *Lindstrom v. Jayud Glob. Logistics Ltd. et al.*, No.

1:25-cv-09662 (S.D.N.Y. Nov. 19, 2025), Dkt. 1. As observed in a case similarly involving a parallel federal securities action, "allowing Plaintiffs to proceed with their California state court action would encourage duplicative litigation and, consequently, undermine 'the congressional preference for national standards for securities class action lawsuits involving nationally traded securities.'" *In re Edward Jones Holders Litig.*, 453 F. Supp. 2d 1210, 1216-1217 (C.D. Cal. 2006) (quoting *Dabit*, 547 U.S. at 87). This case falls squarely within SLUSA's mandate.

## III. PLAINTIFFS' CLAIMS FAIL INDEPENDENT OF THE FEDERAL STATUTORY BARS

### A. Plaintiffs Do Not Plausibly Allege Aiding-And-Abetting Fraud

Plaintiffs' aiding-and-abetting fraud claim fails because they do not plausibly allege (1) Meta had actual knowledge of the *specific alleged wrongdoing* at the time it was undertaken or (2) Meta substantially assisted the fraud. *First*, Plaintiffs point to allegations about *other* scams involving *different* securities and ads, Opp. 15-16, which suggest, at most, awareness of the generalized problem of scam ads, not the specific JYD fraud. Even if other scams were "virtually identical," *id.* at 16, they would still not plausibly suggest the requisite *actual* knowledge of the JYD scheme itself. *Bradshaw v. SLM Corp.*, 652 F. App'x 593, 594 (9th Cir. 2016); *Diaz v. Intuit, Inc.*, 2018 WL 2215790, at *6 (N.D. Cal. May 15, 2018) (similar); Mot. 14. Even *Bouck I* agreed such allegations were insufficient to support this position. 2026 WL 810036, at *6.

Nor does Meta's ad review process suffice to allege actual knowledge. Opp. 16. Per Plaintiffs, because Meta reviews ads, it must have "necessarily kn[own]" that the people and firms depicted were not "associated with" the advertisers. *Id.* (citing Compl. ¶ 106). But the lone paragraph they cite for this premise does not allege anything about customer records or knowledge from them. Compl. ¶ 106. Nor do Plaintiffs explain how Meta would "necessarily know" what associations third parties might have with one another independent of Meta's services. Nor can Plaintiffs end-run actual knowledge by alleging "Meta's knowledge of the nature and content of the ads." Opp. 16. That was the sole basis on which *Bouck I* found knowledge was alleged, reasoning that the ads were allegedly "facially ridiculous" and each subjected to Meta's automated review process. 2026 WL 810036, at *6. Meta respectfully disagrees with that conclusion. But even assuming the ads were facially ridiculous, Plaintiffs concede nothing about them revealed

their connection to the JYD scheme. Opp. 13 ("Plaintiffs do not allege that Meta's ads contained false or misleading information about JYD specifically."). Plus, Plaintiffs concede Meta's review processes rely on automated technological systems, Compl. ¶ 109, and Meta publicly acknowledges that its "[ad] review process may not detect all policy violations," Dkt. 28-5 at 3. *See also* Mot. 16 (actual knowledge not established by automated reviews).

Plaintiffs' own cases recognize that these attempted shortcuts to actual knowledge fail. None plausibly allege Meta knew of the *specific* fraud. For example, the "red flags … seemingly ignored" in *In re First Alliance Mortgage Co.* were "discoveries of questionable lending practices" by the alleged wrongdoer. 471 F.3d 977, 999 (9th Cir. 2006). The allegations in *In re Woodbridge Investments* were likewise tied to the specific wrongdoers instead of the generalized problem of fraud. 2020 WL 4529739, at *6 (C.D. Cal. Aug. 5, 2020). The plaintiffs there alleged the defendant had a "close business relationship with" one of the alleged wrongdoers and knew of specific suspicious banking activity by the specific wrongdoers. *Id.* at *2, *6. So too with *Bhatia v. Silvergate Bank*, where the defendants allegedly knew of specific suspicious transactions by the specific wrongdoer. 725 F. Supp. 3d 1079, 1117 (S.D. Cal. 2024). Plaintiffs allege nothing comparable here. At most, they allege generalized, "widely reported" scams and the general problem of scam ads "occur[ring] through" Meta's services, which are not sufficient to plausibly allege actual knowledge. *See Diaz*, 2018 WL 2215790, at *1-2.

*Second*, Plaintiffs' claim fails on substantial assistance. Plaintiffs offer no independent arguments on this prong, instead arguing it is satisfied by their deficient allegations of knowledge combined with Meta's "routine operations." Opp. 17. *Liapes* is inapposite; it found that the wrongdoing Meta had allegedly substantially assisted was preventing users from receiving third-party content (i.e., the exclusion *itself* was unlawful), not the publication of allegedly harmful content where the *content* itself was allegedly unlawful. 95 Cal. App. 5th at 927. Plus, Plaintiffs offer no response to Meta's arguments that they fail to allege Meta "reached a conscious decision to participate" in the JYD scammers' fraud, nor to Meta's position that it did not act with "the purpose of assisting another in performing a wrongful act." Mot. 18. And despite citing (Opp. 17) *Barrett v. Apple, Inc.*, Plaintiffs offer no response to its holding that substantial assistance cannot

be established absent allegations of specific assistance to fraudsters "other than the [assistance] granted to *all*" users of the same service. 523 F. Supp. 3d 1132, 1148 (N.D. Cal. 2021).[4]

### B.    Plaintiffs Do Not Plausibly Allege Their Contract And Related Claims

Plaintiffs' contract, implied covenant, and promissory estoppel claims require that Plaintiffs allege an enforceable promise. But they do not address *Bouck*'s rejection of the same assertions of purportedly enforceable promises. *Bouck I* held that these claims hinge on the same language that "does not expressly or impliedly impose a binding contractual obligation on Meta to do anything." 2026 WL 810036, at *7. Similarly, this Court recently held that Meta's Terms "do not amount to a contractual *guarantee* that Meta will respond to any particular problem in any particular manner and therefore 'cannot rise to the level of a contractual duty.'" *Isgur*, 2026 WL 194640, at *7. In short, courts "throughout this district have consistently held that Meta's TOS do not create an 'affirmative obligation' on Meta to act." *Id.* at *6.

As *Bouck I* confirmed, the language on which Plaintiffs rely is "much more naturally read as … creating a duty *of its users* not to pollute Meta's platforms." 2026 WL 810036, at *7. Plaintiffs downplay the language that Meta "may" take action as providing Meta with only an unspecified "measure of discretion" or prohibiting it from "tak[ing] no action at all," Opp. 20, but ignore cases establishing that such language is merely part of a "general monitoring policy," *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1108 (9th Cir. 2009), qualified by "aspirational statements," *Morton v. Twitter, Inc.*, 2021 WL 1181753, at *5 (C.D. Cal. Feb. 19, 2021), that "place restrictions on users' behavior, [but] do not create affirmative obligations" for Meta, *Young v. Facebook, Inc.*, 2010 WL 4269304, at *3 (N.D. Cal. Oct. 25, 2010). Even "stating that Facebook does not allow users to post harmful content and that they *will* remove [such content]" creates no enforceable promise. *Lloyd v. Facebook, Inc.*, 2022 WL 4913347, at *9 (N.D. Cal. Oct. 3, 2022); Mot. 18.

Moreover, where Meta's Terms and policies "even mention[] Meta doing something to prevent fraud," they use "aspirational terms"—not "*promises* to take concrete steps to effectuate that aspiration." *Bouck I*, 2026 WL 810036, at *7. For example, language in Meta's Community

---

[4] Plaintiffs' alternative argument that this claim is supported by Meta's alleged violations of contract or tort duties fails for the same reasons as those claims. *See infra* Parts III.B, III.C.

Standards that Meta "do[es] not allow" scam ads, Opp. 10, appears immediately after a paragraph in which Meta makes clear it is not promising to remove or prevent every fraudulent advertisement, but instead "aim[s]" to do so "to protect users." Compl. Ex. B at 1. Similarly, the statement that Meta "remov[es] content and combat[s] behavior that purposefully employs deceptive means," is part of the same paragraph describing what Meta "aim[s]" to do. *Id.* Language from Meta's Terms that it "employ[s] dedicated teams" and "develop[s] advanced technical systems" to respond to "potentially violating content," is followed by a qualification that, if these processes make Meta aware of "potentially violating content," it "*may* take appropriate action … that *may* include" notification, removal of content, and other potential actions. Compl. ¶ 101. And the statement that Meta "take[s] action on" content that violates its policies, Opp. 18 (quoting Compl. ¶ 106), is not a part of Meta's Terms and instead appears on an introductory webpage collecting links of Meta's content moderation policies, which explicitly state that Meta's "[ad] review process may not detect all policy violations" and qualifies Meta's "actions" as set forth above. Dkt. 28-5 at 3.

Plaintiffs' reliance on *Calise* is misplaced. As they concede, that case analyzed a prior, now inoperative version of the Terms stating that Meta "*will* take appropriate action." Opp. 19-20; Mot. 20 n.13. *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064 (N.D. Cal. 2023) is likewise inapposite. Opp. 19. *Doe* concerned Meta's alleged handling of user data, not its moderation of third-party content. 690 F. Supp. 3d at 1085. Moreover, *Doe* alleged the complete absence of systems to detect potential misuses of its services, *id.*, whereas the Complaint here alleges that such processes existed but could have been more effective. *E.g.*, Compl. ¶¶ 47, 49, 58.

Additionally, each of the quotes Plaintiffs pluck out of context must be read in the context of Meta's Terms, which expressly disclaim any responsibility for content—like the challenged advertisements—published on Meta's services by third parties. Mot. 19-20. That is, whatever language Plaintiffs point to, Meta manifested its intention to *not* create any enforceable promise requiring it to "control or direct what people and others do or say," or assume contractual responsibility for "any content they share." Compl. Ex. A at 9 (§ 4.3).[5]

---

[5] Meta's argument in its opening brief is *not* that its disclaimer "extinguish[es] liability for Meta's breach of express contractual obligations," Opp. 21 n.11; instead, the language disclaims any intent to create express contractual obligations to remove or monitor third-party content in the first place.

Plaintiffs' Opposition also confirms the deficiencies in their implied covenant and promissory estoppel claims. They do not dispute the implied covenant "'is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract.'" *Kroetch v. BAC Home Loan Servs.*, 2011 WL 4502350, at *3 (N.D. Cal. Sept. 27, 2011); *see also Bouck I*, 2026 WL 810036, at *8 (implied covenant cannot be "invok[ed] … *to create new promises*"). Plaintiffs concede the existence of a "binding contract" between them and Meta, Opp. 18, and thus cannot rely on the implied covenant to create an obligation for Meta to monitor for or remove purportedly harmful third-party content, Opp. 21, because no such contractual obligation exists and Meta expressly disclaimed any responsibility for third-party content, *supra* pp.11-12. The lack of dispute over the validity of the contract between the parties is also fatal to their promissory estoppel claim, which may not proceed "'where a valid contract … governs the same subject matter as the alleged promise.'" *Realtek Semiconductor Corp. v. LSI Corp.*, 2013 WL 4778140, at *1 (N.D. Cal. Sept. 6, 2013); *see also Bouck I*, 2026 WL 810036, at *8. Finally, Plaintiffs cannot create "questions of fact" as to reasonable reliance by alleging only that they "reasonably relied on Defendant's promises when using Meta's products." Compl. ¶ 167; Opp. 22. That "formulaic recitation of the elements of a cause of action will not do" to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plus, any reliance would have been neither reasonable nor foreseeable given Meta's express disclaimer of any obligation to remove potentially harmful third-party content. *Supra* pp.11-12.

### C.    Plaintiffs Do Not Plausibly Allege Negligence

Plaintiffs do not plausibly allege their negligence claim. To start, it is barred by the economic loss rule. Plaintiffs unsuccessfully try to evade application of the rule by claiming a "special relationship" as that term is used in a limited exception to the rule. Opp. 24. But Plaintiffs ignore that the "special relationship" exception applies only to plaintiffs "not in privity" with the defendant. *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 923, 938 (2022). When "tort claims for monetary losses" are raised "between contractual parties," those claims are barred "when they arise from—or are not independent of—the parties' underlying contracts." *Id.* at 923. Plaintiffs do not plausibly allege their negligence claim is independent of their contract with Meta.

Plaintiffs invoke *Bouck I* to argue their claims are independent of their contract based on Meta's supposed "active role in creating and facilitating the scam ads," which they claim is "unrelated to any contract between the parties." Opp. 23. *Bouck I* reasoned that "the contract … does not cover this course of conduct" because it "does not impose on Meta *any* obligations to police conduct on its platforms," 2026 WL 810036, at *9, but that ignores that the disclaimer *does* cover this conduct and expressly provides that Meta has no such obligation, *supra* pp.11-13. Imposing negligence liability for those actions, despite Meta's contractual disclaimer of liability for third-party content, is thus barred because "it would dictate terms … *contrary* to the parties' allocation of rights and responsibilities." *Sheen*, 12 Cal. 5th at 925. And *Bouck*'s reasoning that the rule did not apply because of Meta's alleged "development of the offending ads" is based on the same erroneous reasoning as its material contribution holding, fails for the same reasons, and would trigger SLUSA's bar even if correct. *Supra* pp.5-8. Plaintiffs also argue they allege "emotional distress," Opp. 24, but do not address precedent holding that "tort damages, such as 'damages for mental suffering and emotional distress[,] are generally not recoverable'" under a claim that "is not independent of" the contract governing the parties' obligations. Mot. 23.

Beyond the bar of the economic loss rule, Plaintiffs' negligence claim fails because it depends on their assertion that they "allege malfeasance, not mere nonfeasance." Opp. 22. In support, they rehash the same arguments that Meta "created" the ads, despite their concessions that the scammers provided the allegedly fraudulent message. *Supra* pp.1-2. They also add the argument that Meta "deliberately cultivated relationships with scammers," but do not provide any citation for this assertion or that Meta had anything but the same arm's length relationship with the JYD scammers as with any third-party advertiser. Opp. 22. And they now argue that Meta's negligence is based on its purportedly "allow[ing] scam ads to proliferate," *id.*, but that is precisely the point: such allegations that Meta merely did not prevent third-party scammers from causing harm to Plaintiffs amount only to nonfeasance, not misfeasance.[6]

Plaintiffs largely ignore the cases cited in Meta's opening brief, and do not meaningfully

---

[6] *Bouck*'s holding to the contrary was based on the same incorrect reasoning as its Section 230 material contribution holding. 2026 WL 810036, at *9; *see supra* pp.1-4.

address their holdings that websites engage only in nonfeasance when they allegedly fail to prevent harm inflicted by third parties. Opp. 22-23. Their citation to *Forrest* is distinguishable for the same reasons described above; the court described the argument in that case as a "premature factual retort" because there was a factual dispute over the scope of the scammers' contributions to the ads. 737 F. Supp. 3d at 821. Plaintiffs' own allegations here eliminate any dispute. *Supra* p.4. As Meta's cases make clear, the provision of neutral tools does not constitute misfeasance supporting a duty sounding in negligence, even where third parties misuse those tools to cause harm. Mot. 22-23. And Plaintiffs do not dispute they and Meta did not have a "special relationship" as that term is used to establish the existence of a duty in cases of misfeasance. *Id.* at 23.

### D.    Plaintiffs Do Not Plausibly Allege Unjust Enrichment

Plaintiffs distort Meta's arguments on unjust enrichment. Meta's position is not that the mere "existence of a contract … preclude[s]" this claim, Opp. 25, but instead that an enforceable contract on the same subject matter forecloses duplicative quasi-contract claims, Mot. 24-25. Here, it is undisputed that there was a valid contract in which Meta expressly disclaimed any obligation to remove or prevent the creation of third-party content. That is an enforceable agreement on the same subject matter, regardless of the fact that it disclaims, rather than imposes, Plaintiffs' asserted obligations. Plaintiffs rely on *Bouck*'s decision allowing this claim to proceed in the alternative, Opp. 25, but ignore *Isgur*, which prohibits bringing an "action for unjust enrichment in the alternative" unless Plaintiffs "plead[] facts suggesting the unenforceability or invalidity of the contract at issue." 2026 WL 194640, at *10. Because they allege no such facts, this claim is barred.[7]

## IV.    DISMISSAL SHOULD BE WITH PREJUDICE

Plaintiffs do not respond to Meta's argument for prejudicial dismissal, instead requesting in one sentence that dismissal be without prejudice. Opp. 25. They identify no fact or theory they could add that would render their claims plausible and legally viable. Their failure to "explain why the amendment would not be futile" requires dismissal with prejudice. *Foskaris v. Experian Info. Sols., Inc.*, 808 F. App'x 436, 439 (9th Cir. 2020). That is particularly so when, as here, further amendment would frustrate Section 230's objectives. *See* Mot. 25 (collecting cases).

---

[7] *Bouck I* did not address the failure to allege unenforceability. 2026 WL 810036, at *11.

Dated: June 18, 2026

Respectfully submitted,

By:/s/ Sonal N. Mehta
**WILMER CUTLER PICKERING HALE AND DORR LLP**
SONAL N. MEHTA (SBN 222086)
JESSICA LEWIS (SBN 302467)
MADEEHA DEAN (SBN 340563)
Sonal.Mehta@wilmerhale.com
Jessica.Lewis@wilmerhale.com
Madeeha.Dean@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

ARI HOLTZBLATT (SBN 354631)
Ari.Holtzblatt@wilmerhale.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6443

*Attorneys for Defendant Meta Platforms, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of June, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

*/s/ Sonal N. Mehta*

Sonal N. Mehta